494 A.2d 212

**Anthony MONIODIS, et al.,**

**v.**

**Marguerite COOK, et al.**

No. 883, Sept. Term, 1984.

Court of Special Appeals of Maryland.

June 20, 1985.

Certiorari Denied Dec. 2, 1985.

2

4

M. Albert Figinski, Baltimore (Arnold M. Weiner, Julie C. Janofsky, Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, James R. Eyler, Richard P. Kidwell and Miles and Stockbridge, Towson, on the brief), for appellants Rite-Aid and Moniodis.

**6**

Read K. McCaffrey, Baltimore (Christopher S. Lambert and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, on the brief), for appellant Spevock.

Stephen D. Langhoff and Nedda I. Pray, Baltimore (Doyle & Langhoff, Baltimore, on the brief), for appellees.

Argued before WEANT and BLOOM, JJ., and ALBERT T. BLACKWELL, Jr., Associate Judge of the Seventh Judicial Circuit, Specially Assigned.

WEANT, Judge.

The appellees, Marguerite Cook, Dorothy Ebner, Diane Ruggiero Leicht, and Iris Torres, brought this action in the Circuit Court for Baltimore City against their former employer, appellant Rite-Aid of Maryland, Inc. (Rite-Aid), and certain Rite-Aid officers, including appellants Anthony Moniodis and James H. Spevock. The appellees alleged that Rite-Aid required groups of employees to submit to polygraph examinations regarding inventory shortages or "shrinkage" at certain Rite-Aid Stores, thereby violating Md.Ann.Code art. 100, § 95 (1979).[1] They further claimed

---

1. During the relevant period, this statute provided in part:
 § 95. Lie detector test as a condition of employment prohibited.
 (a) *Definitions.*—(1) The following words have the meanings indicated.
 (2) The term *"employer"* as used in this subtitle means every employer engaged in any business or enterprise in this State, including the government of the State of Maryland, or any county, incorporated city or town, or other municipal corporation.

 \* \* \* \* \* \*

 (b) *Test prohibited; exemption.*—An employer may not demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector, or similar test or examination as a condition of employment or continued employment. The prohibition of this section does not apply to the federal government or any agency thereof.

 \* \* \* \* \* \*

 (d) *Investigation upon written complaint.*—Upon written complaint by an applicant for employment of an alleged violation of this subtitle, the Commissioner of Labor and Industry may cause an investigation to be made as to the existence of the alleged violation.

that Rite-Aid enforced this policy, acting through Spevock and Moniodis, among others, by firing recalcitrant employees outright or by creating working conditions calculated to force these employees to resign. The appellees sought compensatory and punitive damages under two theories, "abusive" or wrongful discharge and intentional infliction of emotional distress. Following trial in January, 1984, a jury found in favor of the appellee employees on both theories and awarded compensatory and punitive damages. The docket entries indicate that judgments were entered as follows:

6 March 1984 Judgment on verdicts absolute in favor of the plaintiff (Diane Ruggiero Leicht) for the sum of $100,000.00 compensatory damages as against all defendants; punitive damages in the amount of $1,000,000 (One Million) as against Defendant (Rite Aid of Maryland); $750.00 as against Defendant James Spevock; and $500.00 as against Defendant, Anthony Moniodis. In the case of Plaintiff, Marguerite Cook for the sum of $300,000.00 Compensatory damages as against all Defendants, punitive damages in the amount of $1,000,000 (One Million) as against Defendant, Rite Aid of Maryland; $750.00 as against Defendant, James

---

(e) *Mediation and conciliation; injunctive or other relief.*—If the Commissioner determines that a violation exists, he is authorized to endeavor to resolve any issue involved under said violation by informal methods of mediation and conciliation, or he may institute, on behalf of any aggrieved applicant for employment, action in any court of competent jurisdiction in the subdivision in which the violation occurred seeking injunctive relief or other relief including money damages, resulting from the violation under this subtitle.

(f) *Duty of Attorney General.*—The Attorney General is authorized to prosecute all civil cases arising hereunder which are referred to him by the Commissioner for that purpose.

(g) *Penalty.*—Any employer who violates the provisions of this subtitle is guilty of a misdemeanor and subject to a fine not to exceed $100.

Spevock; and $500.00 as against Defendant, Anthony Moniodis. In the case of Plaintiff, Iris Torres for the sum of $200,-000 Compensatory damages as against all Defendants; punitive damages in the amount of $1,000,000 (One Million) as against Defendant, Rite Aid of Maryland; $750.00 as against Defendant, James Spevock; and $500.00 as against Defendant, Anthony Moniodis. In the case of Plaintiff, Dorothy Ebner for the sum of $300,-000 Compensatory damages as against all Defendants, punitive damages in the amount of $1,000,000 (One Million) as against Defendant, Rite Aid of Maryland; $750.00 as against Defendant, James Spevock; and $500.00 as against Defendant Anthony Moniodis, all with interest from date and costs of suit.

On appeal, Rite-Aid and Moniodis present the following myriad of questions for our review:

1. Did the trial court err in submitting to the jury the issue of punitive damages based on "abusive discharges" which occurred in 1979 and 1980 when the Maryland courts did not acknowledge a cause of action for abusive discharge until July 16, 1981?

2. Did the trial court err in submitting the abusive discharge counts to the jury?

3. Did the trial court err in failing to grant a directed verdict for Defendant[s] Moniodis [and Spevock] as to the abusive discharge counts?

4. Did the trial court err in denying Appellants' motion for directed verdict on the intentional infliction of emotional distress counts because there was insufficient evidence of severe emotional distress and extreme and outrageous conduct?

5. Did the trial court err when it denied Appellants' motion for directed verdicts as to Appellees' claims for

punitive damages because there was insufficient evidence of malicious conduct?

6. Was it reversible error for the trial court to allow the jury to consider against Appellant Rite Aid a former Assistant Attorney General's hearsay account of a former Rite Aid employee's alleged admissions?

7. Did the trial court commit reversible error in its evidentiary rulings allowing, but limiting, evidence of the prior Attorney General's investigation and suit?

8. Did the trial court err when it:

(a) instructed the jury that an award could include damages for "future loss of wages and benefits" when there was no evidence of such loss;

(b) instructed the jury that an award of compensatory damages "must include" damages for mental anguish, fright and other matters;

(c) refused to instruct that Appellees, in order to recover for intentional infliction of emotional distress, had to prove that each of them had a severely disabling emotional response to the tortious conduct; and

(d) refused to instruct that Maryland's polygraph statute did not prohibit a transfer of, or reduction in hours for, an employee who refused to take a polygraph test?

9. Did the lower court abuse its discretion when it failed to set aside verdicts which it acknowledged to have been influenced by passion?

Appellant Spevock puts forth the following additional question; others that restate the above issues are omitted.

██ Did the Court err in denying Spevock's Motion in Limine to exclude evidence of Spevock's communications with Assistant Attorney General Redmond?

### 1. and 2.

The appellants argue that the trial court should not have submitted the wrongful discharge counts to the jury. In the alternative, they contend that the trial court should not

have permitted the jury to consider punitive damages under the wrongful discharge counts.

In a case of first impression, the Court of Appeals recognized an employee's cause of action for wrongful discharge as an exception to the general rule that an employment contract of indefinite duration may legally be terminated at any time and for any reason. *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). The *Adler* Court stated that an "at will" employee may recover damages in tort or contract provided that the discharge violated some "clear mandate of public policy." 291 Md. at 43, 432 A.2d at 471. The Court also noted that such a mandate may come in many forms, including "legislative enactments, prior judicial decisions or administrative regulations." 291 Md. at 45, 432 A.2d at 472.

■ There was testimony at trial regarding the termination of each of the appellees which, if believed by the jury, demonstrated that Rite-Aid and its officers violated Md.Ann.Code art. 100, § 95. For example, appellee Leicht testified that Moniodis told her that he fired her because she refused to submit to a polygraph examination. There can be no question that the express legislative prohibition of this type of discharge satisfied the "clear mandate" requirement. Indeed, as noted in *Adler*, 291 Md. at 38–40, 432 A.2d at 468–70, other courts have recognized wrongful discharge actions where the discharge did not violate a criminal statute, but was in retaliation for the employee's refusal to participate in an illegal scheme. *E.g., Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980). The statute here is more explicit, condemning the very conduct upon which the appellees' cause of action is based.

■ The appellants maintain that the polygraph law was not violated in the cases of appellees Cook, Ebner, and Torres. According to appellants, they were not fired but were simply given changes in established working hours, and/or transfers to distant stores, or other changes in

working conditions.[2] We recently held that a *constructive* discharge may form the basis for a wrongful discharge action. *Beye v. Bureau of National Affairs,* 59 Md.App. 642, 653, 477 A.2d 1197, 1203, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984). Under *Beye,* the proper approach is "discard form for substance" and consider whether the terminations, though perhaps formally effected by resignations, were in fact coerced by the employer. *Id.,* 59 Md.App. at 649, 477 A.2d at 1201. Appellants emphasize the absence of any express reference to constructive discharge in the polygraph law, but in our view this does not warrant abandonment of the analysis in *Beye.*

The *Beye* court explained that "the applicable standard to determine if the resignation is, in effect, a constructive discharge, is whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign." 59 Md.App. at 653, 477 A.2d at 1203. Thus, constructive discharge is evaluated under both objective and subjective standards.

In the case at hand, former supervisory employees of Rite-Aid described a general company policy to impose such hour and location conditions as would make continued employment simply fruitless for those who refused polygraphs. One former manager said he was told, with regard to an employee other than the appellees, "[w]ell, we can't fire her outright, but what I want to do is cut her hours back until there is no longer any value for her to work here. She will become frustrated." It is precisely this subterfuge the constructive discharge doctrine is intended to thwart. There was ample evidence that Rite-Aid intended to cause Cook, Ebner, and Torres to resign or to refuse to accept their new working conditions, so that the jury may quite properly have concluded that the subjective element in *Beye*

---

**2.** Our inspection of the record reveals that Cook and Torres were in fact fired after they had refused to comply with transfers and schedule changes.

was satisfied. *See* 59 Md.App. at 651–52, 477 A.2d at 1202. Further, Rite-Aid actually imposed in each case such measures as would reasonably ensure its goal was achieved.

■ Next, appellants argue that the polygraph statute should be interpreted to preclude this common law action because the statute includes a civil remedy for certain persons whose rights have been violated.[3] We disagree. The cases cited by the appellants in this regard are inapposite. *See Dillon v. Great Atlantic and Pacific Tea Co.,* 43 Md.App. 161, 403 A.2d 406 (1979); *Chekey v. BTR Realty, Inc.,* 575 F.Supp. 715 (D.Md.1983). In *Chekey,* the U.S. District Court dismissed the plaintiff employee's common law claim under *Adler* on the ground that there was an available statutory civil remedy. 575 F.Supp. at 717. *See White v. Prince George's County,* 282 Md. 641, 387 A.2d 260 (1978). We seriously doubt that a statutory remedy was indeed available to the appellees in the case at hand. The polygraph statute authorized the Attorney General to prosecute cases referred by the Commissioner of Labor and Industry, who was in turn authorized to institute proceedings only on behalf of "any aggrieved *applicant* for employment," rather than an established employee.[4] § 95(e) (emphasis added). Therefore, we conclude that section 95 does not preclude the appellees' common law action. Rather, wrongful discharge is an appropriate means for enforcing the policy of this statute.

■ We turn now to the appellants' claim that punitive damages are inappropriate because the terminations of the appellees preceded the *Adler* decision, so that the appellants

---

3. Pursuant to section 95, the Attorney General brought a civil action against Rite-Aid on behalf of the appellants and at least twenty-one other employees who were terminated during the same period. *Sachs v. Rite Aid of Maryland, Inc.,* Docket 120A, A–60168 (Baltimore City Cir.Ct.1981). The appellants elected not to join in the settlement reached in that case but to continue with this action.

4. The governmental action against Rite-Aid was apparently settled prior to any judicial determination of the Attorney General's authority to represent the former employees.

lacked notice that their conduct was actionable under Maryland law. There was evidence that Rite-Aid's officers acted with actual malice. *See infra* Part 5. Uncontradicted testimony demonstrated that Rite-Aid was well aware of the prohibition in section 95 but consciously elected to disregard it. Rite-Aid's claim of unfair surprise therefore seems very hollow indeed. In contrast to the circumstances presented in the cases cited by appellants, *e.g., Hansen v. Harrah's,* 675 P.2d 394, 397 (Nev.1984), the awards in this case, we believe, beneficially served the punitive and deterrent purposes of exemplary damages.

### 3.

██ We shall now consider whether the trial court properly denied the additional motions of the individual appellants, Moniodis and Spevock, for directed verdicts on the wrongful discharge counts. In particular, Moniodis and Spevock argue that, as officers of the corporate employer, they cannot be liable for wrongful discharge and, in the alternative, the polygraph statute does not provide the requisite articulation of public policy because it refers only to violations by employers rather than by fellow employees.

We believe the *Adler* court did not intend to create an additional cause of action for wrongfully discharged employees against an individual officer of a corporation, at least where the evidence does not show that the officer was clothed with the essential attributes of an employer. The appellees point to the rule of agency law that an agent who commits "an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal." Restatement (Second) of Agency § 343 (1958). This sheds no light on whether the conduct of Spevock and Moniodis was "otherwise a tort."

The *Adler* opinion indicates that the wrongful discharge may be brought under either tort or contract theories, 291 Md. at 42, 432 A.2d at 470–71, so that the principle of privity of contract would not necessarily apply to restrict

liability to the employer. Nevertheless, *Adler* clearly indicates that wrongful discharge actions, whether in contract or otherwise, are recognized only in the context of an exception to the doctrine that a terminable at will contract may be ended by the parties for any reason. 291 Md. at 42–43, 432 A.2d at 470–71. Admittedly, the terminable at will doctrine itself does not preclude actions between fellow employees; it regulates only the relationship between employer and employee. The wrongful discharge exception to this doctrine should be defined and limited accordingly. In our view the Court of Appeals in *Adler* did not paint with so broad a brush as to create a cause of action against every fellow employee.

This is not to say that an "officer" of a corporation or other business entity who plays a dominant role in the affairs of the corporate employer and who primarily formulates the corporation's decision to fire a particular employee or group of employees should be permitted to take refuge behind the corporate veil in order to insulate himself from liability for his own wrongful conduct. An employee's recourse against such an executive officer should not be limited to the executive's stake in the business.

There is no evidence in this case that Spevock or Moniodis played such key positions. Spevock was Divisional Manager in charge of Rite-Aid's Maryland stores and had some role in developing the polygraph policy at issue, but uncontradicted evidence reflects that a number of officers senior to Spevock also participated in this process and held the ultimate veto power over the policy. Moniodis actually put the policy into action against the appellees. He had little or no policy-making authority, and as a District Supervisor, had managerial control of only seven to twelve stores. Therefore, the wrongful discharge verdicts against these individuals must be overturned.

4.

In addition to wrongful discharge, the jury found the appellants liable for intentional infliction of emotional dis-

tress. In first recognizing such a tort, the Court of Appeals identified four elements which a plaintiff must prove:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977). Appellants maintain that the above elements were not proven in the circuit court, requiring directed verdicts on the counts brought under *Harris*.

■ We shall first consider whether the appellees produced evidence to support a finding that they suffered extreme emotional distress. In the words of the *Harris* court, there must be a *"severely* disabling emotional response," so acute that ' "no reasonable man could be expected to endure it.' " 281 Md. at 570, 571, 380 A.2d at 616 (emphasis in original) (quoting in part Restatement (Second) of Torts § 46 comment j (1965)). Such severity is measured by factors including the intensity of the response as well as its duration. 281 Md. at 571, 380 A.2d at 616. Where extreme and outrageous conduct by the defendant is proven, this may be "important evidence that the distress existed." *Id.* Finally, the distress must be a reasonable response. A plaintiff's pre-existing susceptibility to emotional distress will not always preclude recovery. Where the plaintiff suffers "exaggerated and unreasonable" distress, however, the requirement is not satisfied, unless the defendant was aware of a particular sensitivity that caused the reaction. *Id.*, 281 Md. at 570 n. 2, 571, 380 A.2d at 616 & n. 2.

■ There was no evidence at trial from which the jury could properly have concluded that Ebner, Leicht, and Torres suffered the sort of emotional disablement described in *Harris*. Though each testified that she was upset after the terminations, and suffered symptoms such as increased smoking, lost sleep, and "hives," none indicated that she was emotionally unable, even temporarily, to carry on to

some degree with the daily routine of her life. They produced no expert testimony to that effect. To the contrary, Ms. Torres, for example, said in letters to her husband that she was going through the worst times of her life during the period when Rite-Aid was forcing her out. She added that she was "disgusted." She revealed, however, that she was managing by herself an entire household including several children and her father-in-law, as well as tending to renovations to the family home. Similarly, Ebner and Leicht by their testimony disclosed that they were depressed and unhappy during the period in question but seemed quite capable of tending to necessary matters. Therefore, their claims should not have been submitted to the jury.

■ The reaction of Ms. Cook is another matter altogether. It appears that Cook took her duties at Rite-Aid quite seriously. When Moniodis told her she would be transferred, her hours diminished, and her store keys taken, she was deeply disturbed. Her husband found her at home crying and wringing her hands. There was evidence that she did suffer from a pre-existing nervous condition; her emotional state, however, deteriorated significantly after her termination. She took greater amounts of medication and began to sleep most of the time. She became a recluse, her husband testified, and did not "come out of it" for a year. Relatives came to the home to tend to household chores which Ms. Cook could no longer perform. She took pains to avoid contact with neighbors who might ask her why she no longer worked at Rite-Aid.

In our view, this evidence was more than enough to permit a jury finding that Ms. Cook was severely distressed. Even though there was evidence of some degree of pre-existing sensitivity on Ms. Cook's part, we do not believe her reaction was necessarily unreasonable. Her response was in part attributable to her laudable (though in retrospect misplaced) devotion to Rite-Aid. Further, the jury may properly have inferred that Moniodis was aware

of her dedication when he chose the working conditions that would cause her to leave.

■ In addition to proving that she suffered severe distress, Ms. Cook was required to show that the appellants' actions were "extreme and outrageous." *Harris*, 281 Md. at 566, 380 A.2d at 614. The conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' "; liability does not extend " 'to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Id.*, 281 Md. at 567, 380 A.2d at 614 (quoting Restatement (Second) of Torts § 46 comment d). Finally, in determining whether a defendant's conduct amounted to "major outrage," factors to be considered include (a) " 'the actor's knowledge that the other is peculiarly susceptible to emotional distress,' " (b) the setting of the conduct, especially where an actor (such as an employer) is in a "peculiar position to harass the plaintiff," and (c) the "personality of the individual to whom the misconduct is directed." 281 Md. at 567–69, 380 A.2d at 615–16 (quoting in part Restatement, *supra*, § 46 comment f).

The circumstances surrounding Ms. Cook's departure from Rite-Aid present a veritable witches' brew of the factors described in *Harris*, so much so that the jury may quite justifiably have concluded that the conduct of Moniodis on Rite-Aid's behalf was extreme and outrageous. The actors in this case were an employer and a supervisor, and as such their conduct must be "carefully scrutinized." 281 Md. at 569, 380 A.2d at 615. Other significant ingredients are the testimony reflecting Ms. Cook's dedication to her work, her pre-existing nervousness, and the knowledge of these conditions attributable to Rite-Aid through its officers. Relevant too is the personality of Ms. Cook, a middle-aged lady who did not have the hardened character of a " 'Butte miner' " or a " 'United States marine.' " 281 Md. at 568, 380 A.2d at 615 (quoting Prosser, *Intentional Inflic-*

*tion of Mental Suffering: A New Tort,* 37 Mich.L.Rev. 874, 887 (1939)). Into the boiling kettle was cast the polygraph—by threatening its very use, Rite-Aid challenged the trustworthiness of Ms. Cook and her value as an employee. Rite-Aid through Moniodis aggravated the injury by attempting to force Ms. Cook to resign, rather than by firing her outright. Not satisfied with the mischief he had caused thus far, Moniodis testified against Ms. Cook in a hearing on whether Ms. Cook was eligible for unemployment insurance benefits, taking the position that Ms. Cook was responsible for her firing. Finally, stirring into this ugly mixture the fact that Rite-Aid's actions through Moniodis were willful violations of Ms. Cook's statutory rights made the "cauldron bubble." [5] The jury could properly conclude from this evidence that the appellants' conduct went far beyond the realm of "petty oppressions," and amounted to a complete denial of Ms. Cook's dignity as a person.

We believe the actions against Ms. Cook to be substantially more extreme than the insulting language that was mainly present in *Continental Casualty Co. v. Mirabile,* 52 Md.App. 387, 449 A.2d 1176, *cert. denied,* 294 Md. 652 (1982), and the debt collector's threats of legal action that were at issue in *Dick v. Mercantile-Safe Deposit & Trust Co.,* 63 Md.App. 270, 276, 492 A.2d 674, 677 (1985). Moniodis's actions on behalf of Rite-Aid were more akin to those in *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976), where the plaintiff employee was summarily terminated pursuant to the defendant employer's announced intention of firing his waitresses in alphabetical order until he could determine who was stealing from his restaurant. The *Agis* court ruled that it was a jury question whether the employer's conduct was extreme and outrageous. We reach the same conclusion with regard to the conduct of Moniodis and Rite-Aid.

----

5. William Shakespeare, *Macbeth,* IV, i, 10.

■ As to appellant Spevock, however, we conclude there was not enough evidence of extreme and outrageous conduct to generate an issue for determination by the jury. Though the jury may properly have concluded that Spevock helped to frame the general polygraph policy, there was no evidence that Spevock participated in, authorized, or knew of the specific methods used by Moniodis against Ms. Cook. Indeed, Spevock apparently did not even know Ms. Cook, and so could not have been aware of her particular sensitivities and which working conditions, if imposed, would cause her to resign. *See Harris,* 281 Md. at 567, 380 A.2d at 615.

Two questions remain with regard to Ms. Cook's claim under *Harris:* whether the elements of (1) intentional or reckless conduct, and (2) causation of the emotional distress were satisfied in the claims against Moniodis and Rite-Aid. The very nature of the above-described actions of Moniodis on Rite-Aid's behalf tends to show that they were undertaken intentionally. This inference is bolstered by the testimony of former Rite-Aid managers that Rite-Aid expressly intended to frustrate uncooperative employees. The evidence concerning the cause of Ms. Cook's distress is similarly unequivocal: her testimony and that of her husband revealed that she was affected immediately following and in direct response to her termination.

In sum, the circuit court properly denied the motions of Rite-Aid and Moniodis for directed verdicts on Ms. Cook's *Harris* claim. The court erred, however, in denying the motions as to all other claims under *Harris.*

5.

The fifth issue presented is whether there was sufficient evidence of malice to justify the punitive damage awards.

■ As this tort action arose out of the contractual relationship between Rite-Aid and the appellees, the trial court was correct in instructing the jury that it must find actual, rather than implied, malice in order to award punitive damages, at least with respect to Rite-Aid. *American Laundry Machinery Industries v. Horan,* 45 Md.App. 97,

117, 112–13, 412 A.2d 407, 417 (1980). There are few cases upholding a finding of actual malice, which "has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *H & R Block, Inc. v. Testerman*, 275 Md. 36, 43, 338 A.2d 48, 52 (1975). Nevertheless, we find that the evidence here indicates a level of malice at least equivalent to that shown in *McClung-Logan Equipment Co. v. Thomas*, 226 Md. 136, 172 A.2d 494 (1961), where the court upheld a finding of actual malice on the part of the corporate defendant. In the case *sub judice*, uncontradicted evidence reflects that Rite-Aid through its officers was well aware of the appellees' rights under the statute but terminated the appellees in utter disregard for those rights. For example, one employee other than the appellees refused to submit to the test stating that the polygraph statute prohibited Rite-Aid from forcing her to take it. She was told that "Rite-Aid has its lawyers and that they would take care of that." Further, the jury may well have found that the requirement of "an evil motive or intent," *H & R Block*, 275 Md. at 46, 338 A.2d at 53, was proven by Rite-Aid's use of tactics calculated to frustrate and demoralize the defiant employees.

### 6.

One witness for the appellees was Leonard Redmond, formerly an Assistant Attorney General assigned to the Division of Labor and Industry. Redmond was one of the attorneys who investigated violations of the polygraph statute by Rite-Aid and was involved in the State's civil action on behalf of terminated employees. Redmond's testimony included his recollection of statements by the appellant Spevock in a meeting in Massachusetts. Spevock was no longer employed by Rite-Aid at the time of the meeting and apparently spoke to Redmond with the intention of obtaining immunity from prosecution. Spevock described to Redmond the details of Rite-Aid's policy to require all

employees in stores reporting inventory shrinkage to submit to polygraph examinations, and how employees who refused were removed from their positions.

At trial Rite-Aid objected to the introduction of the Spevock interview through Redmond as hearsay statements of one other than an agent of Rite-Aid. As admissions of a party-opponent, these statements were admissible against Spevock individually. Thus, the trial court properly permitted Redmond to testify. Rite-Aid was entitled only to a jury instruction limiting testimony of Spevock's admissions to the claims against Spevock. When the court did not deliver such an instruction at the close of all the evidence and Rite-Aid raised no objection, any complaint Rite-Aid may have had to the court's failure to instruct was waived. Md.Rule 2–520(e). Further, had Rite-Aid noted a timely objection, we would have concluded that the statements were admissible declarations against Spevock's pecuniary interest. *Agnew v. State,* 51 Md.App. 614, 643–45, 446 A.2d 425, 441–42, *cert. denied,* 294 Md. 441 (1982) (statements to United States Attorney held admissible against another though made in hope of obtaining immunity). The trial judge found that the requirement of present unavailability of the declarant was satisfied, as Spevock was not in the State; he had been summonsed as a trial witness but refused to appear. This finding was not clearly erroneous and shall be affirmed.

7.

■ After some of the appellees' witnesses testified about the State's investigation and lawsuit concerning Rite-Aid's polygraph policy, the appellants attempted to introduce copies of releases executed by former Rite-Aid employees who, unlike the appellees, decided to join the settlement negotiated in the Attorney General's civil suit. The trial court, initially reluctant to admit any evidence of the other proceeding, agreed to admit the release, but ordered that the consideration paid by Rite-Aid be eradicated from the documents. The court stated that these dollar sums could improperly influence the jury's calculation of damages. In

response to this ruling the appellants withdrew the release exhibits. Now the appellants assume the contradictory position that they were denied the opportunity to present evidence of the State's investigation after the *appellees* had "opened the door" to this matter.

Though the appellees produced several witnesses who referred to the State's investigation and suit, the trial court specifically stated that this testimony was admitted only to prove matters revealed through the investigation, rather than as evidence of the investigation *per se*. As a result of the testimony, the trial court in its discretion may have admitted the releases to show the action was settled without an admission of liability. The sums actually paid by Rite-Aid, however, bear no relevance whatsoever to any material issue of fact. For this reason, the trial court properly limited the admissibility of the releases as well as cross-examination of the appellees' witnesses regarding the settlements.

### 8(a).

The trial court instructed the jury that any award of damages could include compensation "for future loss of wages and fringe benefits." The appellants contend that this instruction was improper because there was no evidence tending to show such losses by the appellees.

There was testimony tending to show that some, at least, of the appellees will suffer such future losses. Ms. Cook and Ms. Ebner both were members of retirement plans which have been affected by their terminations. Further, Ms. Leicht's testimony definitely reveals that her future marketability as a prospective employee was adversely affected when she was fired. In light of this evidence and the court's additional instruction that the jury not speculate in setting compensatory damages, we conclude that the instruction was not reversible error.

### (b)

This issue is moot. A correction to the trial transcript pursuant to joint motion of the parties has eliminated the language in controversy.

### (c)

 The next contested instruction relates to the fourth element in *Harris*—the plaintiff's response to defendant's conduct. The appellants requested the following instruction:

Finally, the emotional distress must be severe. Each plaintiff must prove that *she suffered a severely disabling emotional response* to [appellants'] conduct.

(Emphasis added.) The trial court refused this instruction on the ground that it might mislead the jury to believe that proof of physical disability was required. Instead, the judge delivered the following instruction:

Now, the fourth and last element of intentional infliction of emotional distress is that the plaintiff or plaintiffs must show that they or *she suffered severe emotional response* to defendants' wrong conduct. That distress must be *so severe that a reasonable man or woman could not be expected to endure it.*

(Emphasis added.) We believe the court's instruction fairly covers the fourth element as described in *Harris,* 281 Md. at 570–73, 380 A.2d at 616–17. Md.Rule 2–520(c).

### (d)

The trial court correctly refused to instruct the jury that the polygraph statute does not prohibit involuntary transfers and hour reductions in retaliation for refusals to submit to polygraph examinations. This instruction could have led the jury to conclude that a constructive discharge is not actionable, contrary to our holding in *Beye, supra.*

### 9.

 The trial court properly exercised its discretion in refusing to set aside the jury's verdicts based on the amounts awarded. In our view the judge's comments require neither justification, apology, nor defense.

As to Rite Aid, the jury heard from a great deal of evidence about the practices of Rite Aid, not only those directed toward these particular individuals, but the gen-

eral employment practices of the corporation, and while they are large awards, may have been dictated to some extent by passion, I do not think there was any prejudice involved, and I can well understand that their passions were aroused at the conduct of Rite Aid which this Court feels was indeed extreme and outrageous. Again, I do not see that I can interfere with the appraisal of the jury of the amount that would punish Rite Aid, a corporation with the funds it has, which had, according to the evidence which the jury accepted, perpetrated a policy which apparently they thought they could continue because they had the funds to do it, would have to be deprived of funds in order to stop doing it and substantial funds.

## 10.

We need not address Spevock's argument that his oral statements to Assistant Attorney General Redmond were privileged. We have already held that the appellees' claims against this appellant should not have been submitted to the jury and the judgments against him should be reversed. In addition, Rite-Aid and Moniodis did not in their brief adopt Spevock's privilege argument.

We now must consider the judgments. We have held that the following theories were improperly submitted to the jury: (1) the claims of each appellee under *Adler* against Moniodis and Spevock; (2) the *Harris* claims of Ms. Ebner, Ms. Leicht, and Ms. Torres; and (3) Ms. Cook's *Harris* claim against Spevock. The verdict sheets (one for each plaintiff) were arranged so that the jury could base each damage award on either *Adler*, *Harris*, or both.[6] To each

---

**6.** Representative is the verdict sheet for Ms. Cook:

VERDICTS

1. Do you find that any of the Defendants intentionally inflicted emotional distress upon MARGUERITE COOK?

| | | |
|---|---|---|
| RITE AID | Yes ✓ | No ____ |
| SPEVOCK | Yes ✓ | No ____ |
| MONIODES | Yes ✓ | No ____ |

plaintiff the jury awarded lump-sum compensatory damages against the defendants collectively under both *Adler* and *Harris.* Likewise, the jury awarded punitive damages under both theories in amounts differing according to defendant. Of all the numerous awards, only the compensatory and punitive damage awards to Ms. Cook against Rite-Aid can be sustained under both damage theories. These judgments, therefore, should be sustained. The other judgments must be reversed and the case remanded for retrial on the viable theories. Appellant Spevock should be dismissed altogether from the case, because none of the claims against him were supported by the evidence.

▆ The appellees argue that because the jury based each award on the two legal theories independently, those awards that are supported by one valid theory should be affirmed. *See American Laundry,* 45 Md.App. at 108, 412

---

2. Do you find that any of the Defendants abusively discharged MARGUERITE COOK?

| | | |
|---|---|---|
| RITE AID | Yes ✓ | No ___ |
| SPEVOCK | Yes ✓ | No ___ |
| MONIODES | Yes ✓ | No ___ |

3. If you have answered "yes" to any of the above, then in what amount do you find compensatory damages?

$300,000.00

4. (a) If you have found an amount of compensatory damages in Number 3, is the Plaintiff, MARGUERITE COOK entitled to Punitive Damages?

Yes ✓ No ___

(b) If so, in what amount against RITE AID OF MARYLAND?

$1,000,000.00

(c) If so, in what amount against JAMES SPEVOCK?

$20,000

(d) If so, in what amount against ANTHONY MONIODES?

$5,000

A.2d at 514. In our view, *American Laundry* is distinguishable because the plaintiff's legal theories in that case were grounded on precisely the same wrong—the defective product of the defendant. Here, the jury may well have calculated its compensatory and punitive damage awards differently had the case been submitted on only one theory. For example, each appellee claimed lost wages. The jury may have found that the appellees were unable to secure new employment because the wrongful discharges had created blemishes on their employment histories, or because severe emotional distress made new employment impossible. Similarly, the jury may have found under the two theories differing causes of other injuries, including mental suffering, and may have found separate grounds for punitive damages. In our view there is no way to tell from the verdict sheets by themselves which facts the jury relied on in finding that both theories were supported.

 Finally, we note that Ms. Cook's compensatory damages came in the form of one lump sum recoverable from all three appellants; as to two of these, Moniodis and Spevock, we have reversed. Nevertheless, we do not believe that it is necessary to set aside the compensatory damage award to Ms. Cook. Rite-Aid was jointly and severally liable for the entire injury to Ms. Cook, and the prevailing view is that under such circumstance reversal as to some but not all defendants does not require that the judgment be set aside as to the others. *E.g., Chmielewski v. Marich*, 2 Ill.2d 568, 119 N.E.2d 247 (1954).

As we find little merit in the appellees' motion to dismiss or for sanctions, we shall deny same.

JUDGMENTS IN FAVOR OF APPELLEES LEICHT, TORRES AND EBNER AGAINST APPELLANT MONIODIS AND ALL JUDGMENTS AGAINST APPELLANT SPEVOCK REVERSED.

JUDGMENTS IN FAVOR OF APPELLEES LEICHT, TORRES AND EBNER AGAINST APPELLANT RITE-AID OF MARYLAND, INC., AND JUDGMENTS IN FA-

VOR OF APPELLEE COOK AGAINST APPELLANT MONIODIS REVERSED AND CASE REMANDED FOR NEW TRIAL AS TO DAMAGES ONLY.

JUDGMENT IN FAVOR OF APPELLEE COOK AGAINST APPELLANT RITE-AID OF MARYLAND, INC., AFFIRMED.

COSTS TO BE PAID ¼ BY RITE-AID OF MARYLAND, INC., ⅙ BY DOROTHY EBNER, ⅙ BY DIANE LEICHT, ⅙ BY IRIS TORRES, ⅙ BY ANTHONY MONIODIS, AND ¹⁄₁₂ BY MARGUERITE COOK.