Bonnie Susan POLSKY, Appellant

v.

RADIO SHACK.

No. 81–1376.

United States Court of Appeals,
Third Circuit.

Argued Sept. 22, 1981.

Decided Dec. 10, 1981.

As Amended Dec. 17, 1981.

L. Carter Anderson (argued), Edward A. Greenberg, Rawle & Henderson, Philadelphia, Pa., for appellant.

Steven B. Feirson (argued), Alan D. Berkowitz, Dechert, Price & Rhoads, Philadelphia, Pa., for appellee.

Before ALDISERT, HIGGINBOTHAM and SLOVITER, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

Plaintiff Bonnie Polsky appeals from the summary judgment granted to defendant Radio Shack in a diversity action in which she alleges that her discharge from employment violated Pennsylvania law and public policy. Polsky claims that she was discharged because of the results of a poly-

graph test which were obtained in violation of a Pennsylvania statute prohibiting an employer from requiring an employee to submit to a polygraph examination "as a condition for employment or continuation of employment." The statute provides, in relevant part:

A person is guilty of a misdemeanor of the second degree if he requires as a condition for employment or continuation of employment that an employee or other individual shall take a polygraph test or any form of a mechanical or electrical lie detector test.

18 Pa.Cons.Stat. § 7321(a).[1]

Radio Shack does not contest that Polsky was given a polygraph test and it does not contest, for purposes of this appeal, that the results of that test contributed to her discharge. Instead, it moved for summary judgment based on a written release signed by Polsky prior to the administration of the test. The district court concluded that the release was binding and granted the motion, holding that "[w]here, as here, the release signed by plaintiff advised her of her rights under § 7321, and she was not physically compelled to sign, she may not later renounce the statement contained in the release and contend she was compelled to sign it in order to preserve her job." *Polsky v. Radio Shack*, No. 80–2646, slip op. at 3 (E.D.Pa. Jan. 29, 1981) (footnote omitted). The district court rejected Polsky's contentions that the release was invalid because signed under duress and because contrary to Pennsylvania public policy as expressed in section 7321. We conclude that plaintiff's evidence demonstrates a genuine issue as to the material fact that she was required to sign the release as a condition of continued employment, and vacate the summary judgment.

## II.

Polsky was hired by Radio Shack as a management trainee in July 1978; in September 1979 she became manager of Radio Shack's East Norriton store in the Philadelphia area. The staff of the store consisted of Polsky and two other employees. Polsky alleges that on the morning of October 25, 1979,[2] she opened the store as usual and discovered that it had been burglarized of approximately $1,500 worth of merchandise. She reported the theft to the police and to her superiors at Radio Shack. Since there was no sign of forced entry, Radio Shack surmised that the theft had been an "inside job."

On October 30, 1979, Polsky was given a polygraph examination which, according to the complaint, "falsely indicated that plaintiff was lying, and that plaintiff had stolen from defendant and committed other crimes." Prior to taking the polygraph test, Polsky signed a written release advising her of her right under section 7321 not to be required to submit to a polygraph examination as a condition of continued employment; reciting that "[w]ith full knowledge of these rights, and without duress, coercion, force or promise of immunity or reward, I do hereby request a Polygraph examination to be given to me . . ."; and releasing Radio Shack from all claims, actions and liability arising directly or indirectly from her taking the polygraph examination.[3]

1. Subsection (b) of the statute contains the following exception:

    The provisions of subsection (a) of this section shall not apply to employees or other individuals in the field of public law enforcement or who dispense or have access to narcotics or dangerous drugs.

    18 Pa.Cons.Stat. § 7321(b).

2. The complaint allegation that the discovery occurred on October 31, 1979 is patently erroneous since the police report refers to the date as October 25, 1979 and the subsequent poly-

graph examination occurred on October 30, 1979. The date is not in issue in this appeal.

3. The text of the release, in relevant part, is as follows:

    I, *Bonnie Polsky* [handwritten] have been advised that under Section # 7321 of the Act of Dec., 1972 (# 334) of the Commonwealth of Pennsylvania statutes, I may not be required to take a Polygraph (Lie Detection) examination as a condition of my employment or continued employment. With full knowledge of these rights, and without duress, coercion, force or promise of immunity or reward, I do

At her deposition, Polsky testified that she submitted to the polygraph examination because she believed that she had to in order to keep her job. Polsky Dep. at 34.[4] She testified that the issue of a polygraph test was first raised by Radio Shack's district manager Burggraf, and recounted the following conversation:

Q [defense counsel] What did you say when he said that he wanted everybody to take the polygraph test?

A [Polsky] I said, "If I have to, I have to."

Q What did he say?

A "You have to."

Polsky Dep. at 33–35. Polsky testified that she told Burggraf, "I don't want to take the polygraph, but if I have to do it to keep my job, I will take the polygraph," and that he responded, "You have to take the polygraph." Polsky Dep. at 36. In *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1365 (3d Cir. 1979), we held that in light of 18 Pa.Cons.Stat. § 7321(a) the discharge of an employee at will because of a refusal to submit to a polygraph examination required by an employer gives rise to a cause of action for tortious discharge under Pennsylvania law. Under analogous reasoning, Polsky's testimony, if believed by the trier of fact, would support this action for tortious discharge unless the release signed by Polsky operates to relieve Radio Shack of liability.

Polsky testified that she signed the release under the following circumstances:

A Mr. Hoffman [the polygraph examiner, an employee of Guardsman Security Systems, Inc.] sat me down and said "We can get underway as soon as you put your name there and you put your name there," where he had already checked, and he said, "You have seen these before and you know you have to sign them," and I said, "Yes," and he said, "Let's get into the questioning."

Q Had you seen it before?

A The first time I took a polygraph I had to sign a release of some sort of which I didn't know what I was signing.

He made it perfectly clear for me to sign back there and to sign back there and let's get underway, because he said, "You are here on a very serious charge." He had me quite nervous.

Q He told you you were here on a very serious charge?

A Yes.

Q What did you say to him on response?

A I didn't.

Q Did you ask him for an opportunity to read this thing that you were signing?

hereby request a Polygraph examination to be given to me by an officer and/or employee(s) of the Guardsman Security Systems, Inc. for the mutual benefit of myself and *Radio Shack* [handwritten].... Intending to be legally bound, I remise, release, waive and forever discharge all and each of the above corporations, firms and individuals from any and all actions or cause of action, claim or demand, liability or legal actions which I have now or may ever have resulting directly or indirectly or remotely both from my taking said examination and the oral and written opinions rendered because of said examination. In witness whereof I have hereunto set my hand and seal [signed].
This examination was concluded at [left blank] on the above date. Having submitted myself freely to this examination, I hereby re-affirm my agreement as expressed above. I swear that during said examination, I was well treated and remained of my own free will, knowing that I could leave at any time I so desired. I also swear and certify that there were no threats or harm done to me or any promises made to during the entire time I have been here, either in connection with the examination or the signing of this form. [signed]
It is not clear whether Polsky signed the release both before and after the examination, as the form provides.

4. It would have been preferable for the parties to have filed the depositions of Polsky and Burggraf in connection with the motion for summary judgment and response thereto. Since portions of the depositions were relied upon by Radio Shack in its motion for summary judgment, they were cited extensively by both parties in their memoranda of law submitted to the district court on the motion for summary judgment, and they have been filed as part of the record in this court, Radio Shack cannot now complain they are not before us. *See McDaniel v. Travelers Insurance Co.*, 494 F.2d 1189 (5th Cir. 1974) (per curiam).

A  No, I didn't.  I felt extremely threatened and harassed and I wanted to get it over with as quickly as possible.

Q  But you knew it was a release of some kind?

A  No, I didn't know that.

Q  What did you think you were signing?

A  If I didn't sign it that they wouldn't give me my polygraph, which I had to take in order to keep my job.

Q  What did you think it was?  What did you think this piece of paper was?

A  I don't know.

Q  You had absolutely no idea?

A  Honestly, I had no idea.

Q  And you had no curiosity about what it was?

A  What I thought it might have been was that, you know, he's Mark Hoffman and I am Bonnie Polsky, he is giving me a polygraph test on this date. I thought it was just a formalization of what was happening.

Q  It is a lot of writing for that, Miss Polsky.

A  I didn't read it, nor did he give me the time to.

Q  Did you ask him for an opportunity to read it?

A  He had me in the other room.

Q  But at some point in time you must have come to go with Mr. Hoffman, and at that point in time did you ask for an opportunity to read this?

A  No, I didn't.  There was no time. After signing my name he went into ten or eleven questions.

Polsky Dep. at 42–43.

Polsky's version of the facts does not stand uncontradicted on this record.  At his deposition, Burggraf insisted that it was Polsky who had first suggested taking the polygraph examination, that she did so willingly, and that at no time was she told that she had to either take the test or sign the release in order to keep her job.  Burggraf Dep. at 35–38.

■  In considering a motion for summary judgment, the court is to view the evidence before it "in the light most favorable to the party opposing the motion." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The contradictory deposition evidence was sufficient to create a genuine issue of fact as to whether Polsky signed the release under threat of losing her job if she did not. We must therefore determine whether, assuming that Polsky's version of the facts is accepted, the release bars this action.

### III.

Polsky argues that the release in this case offends Pennsylvania's public policy as reflected in the Pennsylvania statute.  The district court rejected the contention that any release of liability for an employer-required polygraph examination is void as an illegal contract.  The court stated that "[t]o adopt plaintiff's approach, at least in the case of a release which clearly sets forth an employee's rights under § 7321 and states the signer acted without duress, would be effectively to ban the giving of polygraph examinations by employers."  Slip op. at 3–4.  The court believed such a result would be contrary to the language and intent of section 7321, which "clearly contemplates that a lie detector test may be given to an employee as long as it is not required as a condition of employment."  Slip op. at 3.

We need not decide whether every release such as that signed by Polsky is necessarily contrary to the public policy expressed in section 7321.[5]  On appeal, Polsky

---

**5.**  Radio Shack concedes that under a statute such as New Jersey's which prohibits even the *requesting* of a polygraph examination, releases might always be contrary to public policy but it insists that Pennsylvania's statute, which only prohibits the *requiring* of polygraph tests, evinces an entirely different legislative intent. In *Perks v. Firestone Tire & Rubber Co.*, 611

F.2d 1363, 1365–66 (3d Cir. 1979), we characterized the New Jersey polygraph statute as "similar" to Pennsylvania's statute, but did not consider the relevance of the distinction drawn by Radio Shack in this case.  We note, however, that in *Employers Liability Assurance Corp. v. Greenville Business Men's Association*, 423 Pa. 288, 291–92, 224 A.2d 620, 622–23

does not contend that every release would be invalid. Nor is she arguing that the release here is unenforceable on its face. Instead, she argues only that this release is invalid because she can establish that *she was compelled to sign the release* and submit to the polygraph examination under the threat of being fired from her job as manager of the East Norriton Radio Shack store. The district court recognized that Polsky was claiming that she was required to sign the release, but ruled that Polsky could prevail only if she could meet the duress standard usually required by Pennsylvania courts to invalidate releases. Polsky contends that if she can show that she was compelled to sign the release as a condition of her continued employment, then she need not necessarily show duress in the traditional sense because giving effect to this release would violate Pennsylvania's public policy.

In *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 892 (3d Cir. 1975), we summarized Pennsylvania's law applicable to releases as providing that "[a] signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake." We recognized that in some circumstances a release may offend public policy but we held that the release in that case, which waived past antitrust claims but did not waive damages for future violations, did not offend public policy. *Id.* at 896 n.27. The Pennsylvania Supreme Court has emphasized that an exculpatory clause, which it categorizes as similar to a release, will be enforced if " 'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State . . . .' " *Employers Liability*, 423 Pa. at 291, 224 A.2d at 622–23 (citations omitted). *See Boyd v. Smith*, 372 Pa. 306, 309–10, 94 A.2d 44, 46 (1953); *Leidy v. Deseret Enterprises, Inc.*, 252 Pa. Super. 162, 167, 381 A.2d 164, 167 (1977). Thus, we must decide whether a release of claims for violation of section 7321 which was itself obtained under threat of job ter-

mination contravenes Pennsylvania's public policy.

Although we do not have the benefit of any legislative history accompanying the enactment of section 7321, the strong public policy embodied in that statute is apparent from its face. Even before its enactment, the Pennsylvania Supreme Court characterized polygraphs as unreliable and fallible, and referred to the strong public policy against their use. *DeVito v. Civil Service Commission*, 404 Pa. 354, 360, 172 A.2d 161, 164 (1961). The New Jersey Supreme Court has reasoned that such a statute is needed because "[t]here is no judicial control when an employer subjects his employee to a lie detector test and there is no licensing or other objective method of assuring expertise and safeguard in the administration of the test and the interpretation of its results." *State v. Community Distributors, Inc.*, 64 N.J. 479, 482, 317 A.2d 697, 699 (1974). *See also* Hermann, *Privacy, The Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing*, 47 Wash.L.Rev. 73, 97–102 (1971). *In Perks v. Firestone Tire & Rubber Co.*, 611 F.2d at 1366, we concluded "that Pennsylvania's anti-polygraph statute embodies a 'recognized facet of public policy' ".

■ The action of the Pennsylvania legislature in making criminal an employer's compulsion that its employee submit to such an examination as a condition of continued employment reflects the legislature's recognition of the uniquely vulnerable position in which such an employee is placed. As the New Jersey Court recognized, "there [is no] assurance of true voluntariness for the economic compulsions are generally such that the employee has no realistic choice." *State v. Community Distributors, Inc.*, 64 N.J. at 484, 317 A.2d at 699. If an employer, although prohibited from requiring an employee to take a polygraph examination as a condition of employment, could nonetheless

---

(1966), the Pennsylvania Supreme Court indicated that a release would be valid only if " 'each party is a free bargaining agent' " and the clause is not in effect " 'a mere contract of

adhesion, whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely' " (citation omitted).

require the same employee to sign a release and thereby insulate itself from liability, the legislative intent would be thwarted. We believe that the Pennsylvania legislature did not intend to allow employers to circumvent section 7321 by requiring indirectly what they cannot require directly. Consequently, we hold that a release from liability for violation of section 7321(a) is not valid if signing of that release was required as a condition of employment or continued employment. We further hold that plaintiff in this case has adduced sufficient evidence to create a genuine issue as to whether she signed the release under such compulsion, and that summary judgment was therefore inappropriate.

Radio Shack argues that this result is inconsistent with our decision in *Three Rivers Motor Co. v. Ford Motor Co., supra.* In that case, which involved a release from antitrust liability executed as part of a major commercial transaction between two sophisticated corporations assisted by counsel, we stated that "where the contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm." 522 F.2d at 893. We also stated:

> Assuming for the moment that the facts offered to demonstrate duress are as alleged by Three Rivers, they fail as a matter of law to constitute grounds for setting aside the release. At most, the facts indicate that economic conditions of the marketplace induced Three Rivers to sign the release, *but there is no allegation that Ford applied any illegal pressure.* Duress is not established merely by showing that the release was given under pressure of the financial circumstances disclosed here.

522 F.2d at 893 (emphasis supplied).

 As we have held, where an employee can show compulsion under threat of job termination to sign a release from liability under section 7321, the employee need not show duress to invalidate the release because it would contravene Pennsylvania's public policy. We note, however, that not only do the parties in this case stand in a substantially different position to each other than they did in *Three Rivers,*[6] but Polsky also has testified to acts which, if believed, would constitute "illegal pressure" by Radio Shack, thus distinguishing this case significantly from *Three Rivers.*

For the foregoing reasons, we will vacate the summary judgment granted to defendant Radio Shack and remand the case for further proceedings.

**6.** We do not hold that the economic duress which inheres in the employer-employee relationship is, *ipso facto,* sufficient to invalidate a release. There is, however, precedent in Pennsylvania for the position that economic duress resulting from a disparity of bargaining power, such as that inherent in the employer-employee relationship, can render exculpatory clauses invalid. *See Phillips Home Furnishings, Inc. v. Continental Bank,* 231 Pa.Super. 174, 181–82, 331 A.2d 840, 843–44 (1974), *rev'd on other grounds,* 467 Pa. 43, 354 A.2d 542 (1976) (Supreme Court held issue had not been properly before Superior Court and expressly declined to reach it).