494 A.2d 239

**William S. TOWNSEND, III**

v.

**L.W.M. MANAGEMENT, INC., d/b/a Gateway Motel, Inc., et al.**

**No. 1094, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

July 3, 1985.

Certiorari Denied Oct. 21, 1985.

56

58

Neil J. Ruther, Baltimore (Burke, Gerber, Wilen, Franco-mano & Radding, Baltimore, on brief), for appellant.

William G. Duvall, Salisbury (Long, Hughes, Bahen, Du-vall & Dashiell, Salisbury, on brief), for appellees.

Argued before WEANT, GETTY and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

William S. Townsend, III, appellant, former manager of L'Auberge Restaurant at the Gateway Motel in Ocean City, Maryland, was discharged by Leighton W. Moore, Jr., the president of L.W.M. Management, Inc. d/b/a Gateway Motel, Inc., appellees, after he took a lie detector test[1] initiated by appellees. Appellant filed suit for abusive discharge against appellee in the Circuit Court for Worcester County. Appellee's motion for directed verdict[2] at the end of appellant's case was granted by the court on the grounds that it was uncontroverted that the test was not required as a condition of continued employment and that no sufficient evidence of duress to take the test was shown. On appeal, appellant presents the following questions:

1. Whether an employer violates Maryland's anti-polygraph law (Art. 100, Sec. 95) by requiring an employee to take a polygraph test under circumstances which reasonably indicate that the employee will be fired if he refuses to take the test without any express threat of termination?

2. Whether the court erred in holding as a matter of law that an employer does not make a demand to submit to a polygraph test conditioned on the continuation of the employment when he advises an employee that money has been stolen, that the employee is one of four people suspected of taking the money, that all four such people are taking polygraph tests, that only

---

1. The results of the lie detector test were not disclosed to appellant.

2. The case was tried prior to July 1, 1984 and therefore, under the former Rules of Procedure, specifically, former Md.Rule 552 (present Rule 3–519). Under the new Rules, a motion for judgment (not directed verdict) must be made.

Appellees' Motion for Directed Verdict was made on four (4) specific grounds: (1) insufficient evidence that plaintiff was required to take the lie detector test; (2) insufficient evidence of causal relationship between dismissal and the administration of the lie detector test; (3) plaintiff's claim is barred by Art. 100, § 95; (4) insufficient evidence of damages.

those four had access to the funds and that he wanted all such employees to take the test?

3. Whether the court erred in excluding evidence of the state of mind of the appellant concerning the likely consequences of any refusal to submit to a polygraph test?

### 1.

Appellant urges that when an employee, without an express threat, is requested by his employer to take a polygraph test, under circumstances which reasonably indicate that failure to take the test will result in dismissal, there is a violation of Md.Code Ann., Article 100, § 95, and, therefore, a cause of action for abusive discharge.[3]

■ In *Adler v. American Standard Corporation*, 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals considered whether the common law right to discharge employees at will should be modified. Recognizing, as a general rule, Maryland's adherence to the common law principle, "that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time," (citations omitted) *Id.* at 35, 432 A.2d 464, the Court held that Maryland does "recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." *Id.* at 47, 432 A.2d 464. This conclusion was reached after taking into account the employee's interest in job security, "particularly when continued employment is threatened not by genuine dissatisfaction with job performance", *Id.* at 42, 432 A.2d 464, the employer's interest in "being able to discharge an employee when it is beneficial to his business", and socie-

---

**3.** Appellant studiously and carefully refrains from focusing on the requirement that he be discharged. As we will see, *infra*, whether a cause of action for abusive discharge will lie is dependent upon whether and how the employer's actions resulted in appellant's discharge.

ty's interest in "ensuring that its laws and important public policies are not contravened." *Id.*

■ It is society's interest upon which primary focus is required. The source of the "clear mandate of public policy" may be found in legislative enactments, prior judicial decisions and administrative regulations, or it may be undeclared, in which case, extreme care must be taken to insure that it is, in fact, the policy of the State. In any case, the public policy found must be "sufficiently clear to provide the basis for a tort or contract action for wrongful discharge." *Id.* at 42, 432 A.2d 464.

Appellant argues that the express terms of Art. 100, § 95 are a legislative expression of the public policy of the State, the contravention of which gives rise to a cause of action for abusive discharge. Section 95(b) provides:

Test prohibited; exemption—An employer may not demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector or similar test or examination as a condition of employment or continued employment. The prohibition of this section does not apply to the federal government or any agency thereof.

Section 95(g) makes it a misdemeanor, subject to a fine of up to $100.00, to violate the statute.

■ Being mindful of the definition of public policy adopted in *Adler, supra,* at 45, 432 A.2d 464 (citing *Md.— Nat'l Cap. P & P v. Wash. Nat'l Arena,* 282 Md. 588, 605, 386 A.2d 1216 (1978):

Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law, (citation omitted)

as well as the admonition of the Supreme Court:

The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deduc-

ible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection. The public policy of one generation may not, under changed conditions be the public policy of another,

*Patton v. United,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930), we conclude that Article 100, § 95 is a "clear mandate of public policy", that employers may not demand or require employees or prospective employees to take polygraph examinations as a condition of employment or continued employment, on which an action for abusive discharge may be based. *Moniodis, et al. v. Cook, et al.,* 64 Md.App. 1, 494 A.2d 212 (1985). This policy is clearly and unequivocally expressed in the statutory prohibition and its violation is punishable by criminal sanction. Our conclusion is supported by cases from other jurisdictions which have considered the question. *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (Pa.1978). *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974), *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3rd Cir.1979), *Polsky v. Radio Shack,* 666 F.2d 824 (3rd Cir.1981), *Lally v. Copygraphics,* 85 N.J. 668, 428 A.2d 1317 (1981), *State v. Comm. Distributors, Inc.,* 64 N.J. 479, 317 A.2d 697 (1974).

■ Although they acknowledge that § 95 does not provide a remedy for all of the conduct prohibited, appellees, nevertheless, argue that the remedy it provides is exclusive. We reject that argument. *See Moniodis, supra. In White v. Prince George's Co.,* 282 Md. 641, 387 A.2d 260 (1978), on which appellees rely, in addition to the "ordinary action at law or in equity" available to the appellant, there existed a "comprehensive remedial scheme". It was in that context that the Court observed:

Where there exists a special statutory remedy for the resolution of a particular matter, as well as an ordinary action of law or in equity, whether the special statutory

remedy is exclusive, and preempts resort to the ordinary civil action, is basically a question of legislative intent. . . . [A]bsent a legislative intention to the contrary, it will usually be deemed that the Legislature intended the special statutory remedy to be exclusive. (citations omitted)

*Id.* at 649, 387 A.2d 260.

The special statutory remedy contained in § 95 is far from comprehensive. Additionally, it does not apply to a class of persons protected by its provisions. While the Attorney General is authorized to prosecute civil suits arising under the section and referred to him by the Commissioner of Labor, § 95(f), he is not *required* to prosecute them; furthermore, the cases as to which authorization to prosecute is given are limited to those involving an "applicant for employment". § 95(d) & (e), *Moniodis, supra.*

We turn next to the question whether a violation of Article 100, § 95 requires an express threat or statement by the employer that the employee will be discharged if he or she does not take the examination.

▇▇▇ A ruling on a motion for directed verdict requires the trial judge to consider the evidence presented, together with all reasonable and legitimate inferences deducible therefrom, in the light most favorable to the party against whom the motion is made. *Gleason v. Jack Alan Enterprises, Inc.* 36 Md.App. 562, 374 A.2d 408 (1977). If but one inference with regard to the issue involved can be drawn, the moving party is entitled to have his motion granted. *Smack v. Jackson,* 238 Md. 35, 207 A.2d 511 (1965). Where, however, there is any legally relevant or competent evidence, no matter how slight, from which a rational mind could infer a fact in issue, then the judge, because the motion should have been denied, invades the province of the jury by granting the motion for directed verdict. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 389 A.2d 887 (1978), *Beahm v. Shortall,* 279 Md. 321, 368

A.2d 1005 (1977), *Ralph Pritts & Sons, Inc. v. Butler*, 43 Md.App. 192, 403 A.2d 830 (1979). *See DiGrazia v. County Exec. for Montgomery County*, 288 Md. 437, 418 A.2d 1191 (1980) (when motive or intent is at issue, generally, motion for summary judgment should not be granted).[4]

With these principles in mind, we proceed to consider the facts presented at trial. On direct examination, appellant testified as follows: One morning, when he came to work, he was informed by the owner of the restaurant that $4,000.00 was missing from the front cashbox, an area to which he claimed no access. He was asked to go to the police station and answer questions, which he did. The owner mentioned the missing money periodically and, eventually, asked appellant to take a lie detector test. Although the owner said that he suspected that the bar manager took the money, he also said that he suspected that four people had access to the cash and that one of those four had to have taken it;[5] appellant was one of the four. Subsequently, the owner made arrangements for the administration of the test and informed appellant as to the time and place for its administration. Appellant took the test on his day off. On the following day, he was fired. In response to the

---

**4.** See *Porter v. General Boiler Casing Co.*, 284 Md. 402, 396 A.2d 1090 (1979) for similarity between role of judge in ruling on motion for summary judgment and on motion for directed verdict. *But see Coffey v. Derby Steel Co.*, 291 Md. 241, 434 A.2d 564 (1981).

**5.** In response to the question, "What, if anything, did he say about why he wanted four of you to take the test?", appellant testified "He suspected four people had access to the cash and that one of those four people had to have taken the money". This response prompted this colloquy between appellant and the court:

> THE COURT: All right. Excuse me a minute. Is that what he told you, that one of the four must have taken the money? Now, were those your words or his?
> THE WITNESS: I interpreted his words meaning four people had access to the cash and that is why those four people were being asked to take the lie detector test.
> THE COURT: Is that what he told you?
> THE WITNESS: Yes.

question, "Why did you take the test?",[6] appellant testified, "Because I was requested to take the, take the test." and "I had nothing to hide because I was innocent. And If I didn't take it . . . if I didn't take it it would be an admission, in my interpretation, of guilt."

On cross-examination appellant admitted that he signed a form containing the following language: "I hereby voluntarily request that I be examined by the Polygraph (Detection of Deception) Technique. I understand and agree that the results of the polygraph examination may be made available to the proper authorities". He also admitted that he was never told, prior to the administration of the test, that he had to take the test or that he would be fired if he refused to take it. Appellant denied having requested the lie detector test.

Focusing on the use of the terms "demand" and "require", and arguing that § 95 does not prohibit all lie detector tests, appellees contend that "there was no legally sufficient evidence that they either demanded or required appellant to take the test as a condition of his continued employment." In fact, appellees continue, the evidence was conclusive that the test was completely voluntary, as evidenced by the "consent form" signed by appellant.

On the other hand, appellant, conceding that no express threat to terminate employment was made, views the judge's ruling and appellees' argument as depriving § 95 of its functional usefulness as "a protective measure for employees". He argues that in the context of an employer-employee relationship, the circumstances surrounding the "request", not just the words spoken, are controlling and that the inferences to be drawn therefrom are for the jury. Appellees and the trial judge relied upon the absence of testimony of a direct or express threat made by Moore, the lack of specific testimony that appellant took the test be-

---

**6.** The court had previously sustained objections to the questions, "Why did you say that [you were willing to take the test]?" and "Did you have a reason for agreeing to take the test?".

cause of his fear of being fired if he did not, and the testimony that someone other than appellant was suspected of being the thief. We have considered all of appellant's testimony and concluded that it, and the inferences fairly deducible therefrom, permit the contrary inference.

*Beye v. Bureau of National Affairs,* 59 Md.App. 642, 477 A.2d 1197 (1984) is instructive. There, we recognized that an action for abusive discharge may be maintained by one whose employment was terminated by his resignation, "if the resignation was indeed an involuntary one, coerced by the employer". Such a discharge would be, we said, a constructive discharge. We observed:

> In judging whether a resignation is truly involuntary, the courts have applied an objective standard; the test is not whether the particular employee felt it necessary to resign, but whether "a reasonable person in the employee's shoes would have felt compelled to resign".

*Id.* at 652, 477 A.2d 1197. We then stated the rationale for this standard:

> If an employer directly discharges an at-will employee in such manner as to make discharge an abusive one under *Adler,* it would defy both reason and fairness to immunize him from liability simply because he has been clever enough to effect the abusive separation by forcing a resignation.

*Id.* at 653, 477 A.2d 1197. *Beye* was explicated by *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 486 A.2d 798 (1985), which made clear that coercive settings other than dangerous working conditions, as in *Beye,* may give rise to constructive discharge. In this context, the court said:

> The fact of discharge ... does not depend upon the use of formal words of firing. The test is whether sufficient words or actions by the employer would logically lead a prudent man [or woman] to believe his [or her] tenure had been terminated.... Employees are often asked to resign as opposed to being fired. While this may be done

for any number of reasons, the meaning is clear that the employee is being dismissed.

*Id.* at 387, 486 A.2d 798, (Quoting *Jackson v. Minidoka Irrigation Dist.,* 98 Idaho 330, 563 P.2d 54, 58–59 (1977)). *See also, Cumb. and Penn. R.R. Co. v. Slack,* 45 Md. 161 (1876). In *Staggs,* plaintiffs alleged that they were induced to resign under threat of discharge, which the court indicated presented a factual issue not resolvable on summary judgment.

■ Just as a discharge may be constructive, so too may a "demand" or "requirement". As in the case of constructive discharge, the test is an objective one, whether a reasonable person in appellant's shoes, in light of the words or actions of his employer, would have felt compelled to submit to the lie detector test. The sufficiency of those words or actions, and their effect, are factual determinations. No specific words are required. *Staggs v. Blue Cross of Maryland, supra. See also, Simko, Inc. v. Graymar Co.,* 55 Md.App. 561, 464 A.2d 1104 (1983). There, faced with the question whether a covenant not to compete signed under threat of discharge was unenforceable because induced by duress, Judge Weant, for this Court, recognized that a threat to induce the execution of such a covenant may constitute duress under appropriate circumstances, and made clear that its existence and effect are questions of fact.

■ Returning to the case *sub judice,* there was neither an express threat to terminate appellant's employment if he did not take the lie detector test, nor any indication, express or implied, that the taking of the test was *not* a condition of continued employment. We think there was ample evidence which would support an inference that the taking of the test was "demanded" or "required". Appellant's testimony was not only that Moore's primary focus was on the bar manager as the thief, but that Moore's suspicions extended to three other persons as well—those whom he perceived had access to the cashbox. It is not surprising, therefore, that all four were requested to take the lie detector test. There

was additional testimony that Moore periodically raised the subject of the missing money with appellant; this testimony strengthens the permitted inference that appellant was a suspect and, just as important, in conjunction with the amount of money taken, demonstrates the seriousness with which the theft was viewed. This, in turn, raises the inference that appellees were determined to get to the bottom of the situation. Add to the circumstances the testimony that appellant took the test because a refusal would be an admission of guilt and this permitted inference becomes even stronger.[7] That Moore made the arrangements for the test, informed appellant of the time and place for its administration, which was on appellant's day off, and, through the operator, required appellant to execute a consent form, are but additional factors from which a jury could conclude that the "request" was actually a "demand" or "requirement". Finally, the employer-employee relationship must also be strongly considered. The circumstances, when viewed in their totality, were such as to permit the triers of the facts to determine that the employer-employee relationship was coercive, appellant could logically and reasonably have concluded that he was required to take the test.

■ Appellees contend that the signing of the consent form is proof that appellant's decision to take the test was

---

7. The trial court acknowledged that appellant's reason for taking the test "perhaps becomes close to duress". Duress is "a wrongful act which deprives an individual of the exercise of his free will." *Eckstein v. Eckstein,* 38 Md.App. 506, 512, 379 A.2d 757 (1978). *See also Central Bank of Frederick v. Copeland,* 18 Md. 305, 317–18 (1862): "The question, whether one executes a contract or deed with a mind and will sufficiently free to make the act binding, is often difficult to determine, but for that purpose a court of equity, unrestrained by the more technical rules which govern courts of law in that respect, will consider all the circumstances from which rational inferences may be drawn, and will refuse its aid against one who, although apparently acting voluntarily, yet, in fact, appears to have executed a contract, with a mind so subdued by harshness, cruelty, extreme distress, or apprehensions short of legal duress, as to overpower and control the will." (citations omitted)

voluntary. This argument suffers from the same infirmity as their prior argument. In *Polsky v. Radio Shack*, 666 F.2d 824 (3rd Cir.1981), just such an argument was rejected. The court reasoned that if an employer, prohibited from requiring an employee to take a polygraph examination in violation of a statute, "could nevertheless require the same employee to sign a release and thereby insulate himself from liability, the legislative intent would be thwarted". *Id.* at 829. We agree. In any event, the effect of the consent form is also a matter for the jury.

■■■ Having resolved the questions argued and briefed by counsel and having determined that the voluntariness of appellant's decision to take the polygraph examination is a question for the jury, we have further concluded that that determination is not dispositive. As we have shown, section 95 protects against "demands" or "requirements" by employers, that employees or applicants for employment take polygraph examinations as a condition of employment or continued employment and that it is this mandate of public policy that undergirds § 95 and subjects an employer to criminal and civil sanctions, including an action for abusive discharge. Although appellant never argues the effect, on his abusive discharge action, of the reason for his discharge, preferring to focus on the nature of the "request", we think the reason for the discharge is both crucial and dispositive. We, therefore, proceed to consider the reason for appellant's discharge.

Appellant was not discharged because he failed or refused to take the examination. The record reflects that, whether voluntarily or involuntarily, appellant took the polygraph examination and, only after the results were analyzed and communicated to appellee, was he fired. It also demonstrates, as we have shown, that appellee was quite concerned about the theft of its money and was determined to find the thief. The only conclusion to be drawn from these facts is that appellant was discharged

because appellee, relying on the polygraph results,[8] determined that appellant was the thief. Unfortunately for appellant, that reason does not contravene this State's public policy as reflected by § 95. This is true even though the determination that appellant was the thief may have been made based on the results of a polygraph examination unlawfully required. Having found that appellant was not discharged for refusing to take the polygraph examination and, thus, his discharge was not in contravention of § 95, we conclude that the trial court did not err in granting appellee's motion for directed verdict.

We need not, and will not, address appellant's remaining issue inasmuch as it is now moot.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

**8.** The record does not reflect the polygraph results of the other three employees, however, the parties agreed in argument that the appellant's results were inconclusive.