568 A.2d 835

**PEOPLES SECURITY LIFE INSURANCE COMPANY**

v.

**Patricia A. WATSON.**

**No. 29, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 31, 1990.

Richard W. Douglas (Lori Kelley Gomulka, on the brief), Hagerstown, for appellant.

Willie J. Mahone, Frederick, for appellee.

Argued before BISHOP, KARWACKI, JJ., and JAMES S. GETTY, Associate Judge of the Court of Appeals (retired) Specially Assigned.

KARWACKI, Judge.

Peoples Security Life Insurance Company (Peoples) appeals from a judgment entered on a jury verdict in the Circuit Court for Washington County in favor of Patricia A. Watson (Watson), the appellee. The jury, rendering a special verdict pursuant to Rule 2–522, found that Peoples had wrongfully discharged Watson, its at-will employee, in contravention of a clear mandate of public policy, and awarded her $15,000 in compensatory damages and $20,000 in punitive damages. Appellant raises three issues for our review:

I. Did the trial court err in denying appellant's motion for judgment based upon appellee's failure to show the violation of a "clear mandate of public policy" sufficient to support a cause of action for wrongful discharge?

II. Did the trial court err in answering the note from the jury without consulting with counsel?

III. Did the trial court err in denying appellant's motion for judgment on the ground that appellee failed to exhaust her available contractual remedies?

We shall answer the first issue in the affirmative and reverse the judgment of the trial court. Consequently, we need not address issues II and III.

### Procedural Background

On March 13, 1986, appellee filed a three count complaint in the Circuit Court against appellant and its employee, John Strausser (Strausser). In Count I, she alleged that she had been employed by appellant since August of 1984; that Strausser had been employed by appellant since the Fall of 1985; and that on January 29, 1986, Strausser, while acting in the course of his employment by appellant, assaulted and battered her by grabbing her around the shoulder and attempting to bite her on her breast. In Count II, appellee alleged intentional infliction of emotional distress by Strausser, while acting in the course of his employment by appellant, as a result of the assault and battery described in Count I. In Count III, appellee asserted that the

assault and battery committed by Strausser upon her on January 29, 1986 had been "preceded by a series of annoying and sexually suggestive comments" to her by Strausser while on appellant's premises and in the course of her employment; that appellant's supervisory personnel had been informed of Strausser's offensive conduct toward appellee, but that appellant had failed to intervene and abate appellee's harassment by Strausser. Appellee sought compensatory and punitive damages against Strausser and appellant.

After appellee's employment was terminated by appellant under the circumstances described *infra,* appellee filed an amended complaint on April 7, 1986, containing six counts. The first three counts substantially repeated the allegations of the three counts of appellee's initial complaint. Count IV alleged that appellee's employment by appellant had been wrongfully terminated on March 28, 1986, in retaliation for her initiation of the instant litigation on March 13, 1986. Court V alleged that appellee's discharge by appellant "constituted a breach of ... [appellant's] duty of good faith and fair dealings." In Count VI, appellee alleged that upon her discharge appellant had converted certain funds she had posted to secure a bond given to appellant in the course of her employment. Appellee sought compensatory and punitive damages from Strausser and appellant for the wrongs alleged in Counts I and II and from appellant for the wrongs asserted in Counts III, IV, V and VI.

At trial, the court granted Strausser's motion for judgment on Count II, but submitted appellee's claim against him under Count I to the jury. Appellant's motion for judgment was granted as to Counts I, II, and III; its motion for judgment on Counts IV and V was denied. Count VI was abandoned by appellee during trial.

Thus, the jury was instructed to determine whether Strausser had committed an assault or battery upon appellee, and if it concluded that he had done so, then to assess compensatory damages against Strausser. The jury was

also instructed that it could, but need not, assess punitive damages against him.

The court submitted appellee's claims against appellant under Counts IV and V to the jury for its special verdict. The court asked the jury to determine whether appellant had wrongfully discharged appellee, and if it had, whether that discharge was "... the result of (a) retribution in contravention of a clear public policy? or (b) violation of the contract of employment?" The jury was instructed that if it found that appellee was wrongfully discharged, compensatory damages should be awarded her. The court further instructed the jury that if it concluded that appellant had wrongfully discharged appellee in contravention of a clear mandate of public policy, punitive damages could, but need not, be awarded.

Explaining the tort of abusive discharge in its instructions to the jury, the court stated:

> The essential elements of abusive retaliatory discharge are one, the existence of an employment relationship; two, the termination of the employment relationship by the employer and three, proof that the motivation of the employer for discharging the employee contravenes some clear mandate of public policy.

> And it is the position of the plaintiff that her termination was motivated solely by her filing of a law suit against John Strausser and Peoples Life Insurance Company alleging assault and battery, intentional infliction of emotional harm and negligent supervision. You will note that neither of those last two counts are before you. But it is her position that she was discharged solely because of the filing of the law suit and therefore contravening a clear mandate of public policy by being punished for exercising her right of redress to the courts.

The jury found that Strausser had assaulted or battered appellee and awarded appellee $300 in compensatory damages against him. The jury declined to award any punitive damages against Strausser. Strausser has satisfied the

judgment entered against him, and he is not a party to this appeal.

The jury also concluded that appellant had wrongfully discharged appellee and that such wrongful discharge was the result of retribution in contravention of a clear public policy rather than a violation of appellee's contract of employment. The jury awarded appellee compensatory and punitive damages against appellant. After its motions for new trial or judgment notwithstanding the verdict were denied, appellant appealed from the judgment entered on that verdict. The appellee has filed no cross appeal.

### FACTS

When we view the evidence offered and all inferences therefrom in a light most favorable to appellee, *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 327, 389 A.2d 887 (1978); *Miller v. Schaefer*, 80 Md.App. 60, 65, 559 A.2d 813 (1989), the following facts were proven at trial.

Patricia A. Watson was employed as a sales agent in appellant's Hagerstown office until she was terminated for alleged "unreported absence and insubordination" effective March 28, 1986. Appellee's contract of employment by appellant provided for termination at the will of either party.

Strausser was employed by appellant as one of several sales managers in its Hagerstown office. Soon after Strausser began his employment at the Hagerstown office in October or November of 1985, he suggested to appellee that he would like to have her on his staff. Becoming more insistent, he said things such as "You're going to work for me whether you like it or not. I'm going to show you how to make real money." Not only did Strausser continue this importuning during working hours, but also he began telephoning appellee at night at her home, saying such things as "I want you to come in here. I have to sleep on the floor

in the office. And doll face you can make a lot of money if you do this."

When appellee informed her sales manager, Michael Leidhecker (Leidhecker), about Strausser's advances, Leidhecker indicated that he would bring this matter to the attention of Harold Shoemaker (Shoemaker), the agency manager who was Strausser's direct supervisor. Relating the incidents to Shoemaker herself, appellee got only a laughing response from Shoemaker who told appellee not to worry about it. Then, on the evening of January 29, 1986, appellee came into the office with Leidhecker. Strausser and one of his sales agents, Bill Bowman (Bowman), were already in the office. Approaching appellee from behind, Strausser placed his hands on her shoulders, and made a biting motion toward her chest, bringing his mouth within an inch of appellee's breast. Even though appellee protested, Strausser repeated this maneuver.

Leidhecker immediately brought the January 29 incident to the attention of Shoemaker. Shoemaker met with Strausser and told him "to stay absolutely away from her [appellee] and do not speak unless you are spoken to."

In February 1986, appellee attended a training session at Hagerstown Junior College. Strausser attempted to grab appellee as she came out of the bathroom, asking "Doll face what's the matter with you." Besides attempting to grab appellee on that occasion, appellant also verbally abused appellee at the training session on that day.

Without any prior notice to Strausser or to any representative of appellant, the initial complaint in the instant case was filed in the Circuit Court on March 13, 1986. Appellant's representatives were made aware of the fact that this action had been filed on March 17 or 18.

On March 13, appellee requested permission from Leidhecker to be absent from work on March 14 so that she could keep a doctor's appointment. On the evening of March 14 or on March 15, appellee telephoned Leidhecker, and advised him that her physician had certified in writing

that she would benefit from a two week medical leave of absence. Leidhecker approved that leave.

Robert D. Williams (Williams), a vice-president of appellant and field supervisor of the area encompassing Hagerstown, learned on March 17 or 18 of the suit filed by appellee on March 13. He advised Shoemaker by telephone that he would come to Hagerstown from his Annapolis office on Thursday, March 20, "to investigate and to try to get a clearer picture of just what the problem was" in connection with the gravamen of the complaint filed by appellee. Also, Williams asked Shoemaker to have the parties involved and any witnesses to the incident of January 29, 1986 present, so he could interview them on March 20.

On March 20, in Hagerstown, Williams interviewed Shoemaker, Strausser, Leidhecker, and Bowman, but was advised that appellee had telephoned and stated that she was not coming in to meet with him. Williams directed Shoemaker to reach appellee by telephone and explain to her that Williams had made a long trip for the specific purpose of investigating the basis for the complaint she had instituted against appellant. Shoemaker did so, but was unsuccessful in persuading appellee to change her mind. While appellee was still on the telephone line, Shoemaker reported this to Williams who then spoke directly with appellee. Despite William's request that she come to the office for a discussion of the problems which prompted her lawsuit, appellee told Williams that she was unwilling to speak with him without having her lawyer present. Williams replied that he was not prepared to talk with her lawyer. Rather, he told appellee that he "simply wanted to talk with her and to see if we couldn't get this thing resolved." When appellee continued to refuse to speak with him, Williams ordered her to appear for work on the following day, and advised her that if she failed to appear, she would be fired. Appellee did not go to work on March 21, and her employment was terminated.

## DISCUSSION

In *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals adopted an exception to the well settled common law rule that a person employed for an indeterminate period, that is on an at-will basis, can be discharged by his or her employer at any time for a good reason, a bad reason or for no reason at all. The Court held that:

> ... Maryland does recognize a cause of action for abusive discharge [1] by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy....

*Id.* at 47, 432 A.2d 464.

While announcing the existence of a cause of action for wrongful discharge under these limited circumstances,[2] the Court recognized the difficulty in determining clear public policy absent some expression of that policy in the constitu-

---

1. In reviewing the development of this exception to the common law rule in other states, the Court observed that various "... courts have characterized this cause of action as one for 'wrongful,' 'abusive,' or 'retaliatory' discharge." *Id.* [291 Md.] at 36 n. 2, 432 A.2d 464. The Court used the terms interchangeably in its opinion.

2. In *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), affirming *Makovi v. Sherwin–Williams Co.*, 75 Md.App. 58, 540 A.2d 494 (1988), the Court of Appeals further limited the cause of action for wrongful discharge. In *Makovi*, the Court held that in cases of discharge motivated by employment discrimination based on race, color, religion, sex or national origin prohibited by Title VII of the Federal Civil Rights Act of 1964 and Md.Code Ann., Art. 49B, §§ 14–18, the statutes create both the right, by way of exceptions to the terminable at-will doctrine, and remedies for enforcing those exceptions.

   We were advised at the oral argument of this case that appellee also filed a complaint against appellant with the Federal Equal Employment Opportunity Commission (EEOC) alleging employment discrimination based on sex because of the actions of appellant's employees which also formed the basis for this action. Prior to the trial of the instant case, the EEOC determined that there was no reasonable cause to believe that appellee was the victim of sex discrimination and notified appellee of her right to file an action under Title VII in the United States District Court. Appellee never pursued such an action.

tions, legislative enactments or prior judicial or administrative decisions. *Id.* at 45, 432 A.2d 464.

In *Ewing v. Koppers Co., Inc.*, 312 Md. 45, 537 A.2d 1173 (1988), the Court held that an employee who was fired for filing a worker's compensation claim had a cause of action for wrongful discharge. The Court reasoned:

> Discharging an employee solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy. The Legislature has made a strong statement to that effect in making such conduct a criminal offense, and our perception of the magnitude of the public interest in preserving the full benefits of the worker's compensation system to employees, and deterring employers from encroaching upon those rights, is equally strong.

*Id.* at 50, 537 A.2d 1173.

In *Leese v. Baltimore County*, 64 Md.App. 442, 468, 497 A.2d 159 (1985), this Court held that an employee had sufficiently pleaded a cause of action for wrongful discharge where he alleged that his discharge was in retaliation for his exercise of his First Amendment rights to criticize the hiring practices of his public employer. Likewise, we held in *Townsend v. L.W.M. Management, Inc.*, 64 Md.App. 55, 62, 494 A.2d 239 (1985) and in *Moniodis v. Cook*, 64 Md.App. 1, 10, 494 A.2d 212 (1985), that Md.Code Ann., Art. 100, § 95, prohibiting an employer from requiring an employee or prospective employee to submit to a polygraph examination, was a clear mandate of public policy by our legislature. Accordingly, an employee who was fired for refusing to submit to such examination had a cause of action for wrongful discharge.

In the case *sub judice*, appellee successfully pressed her suit for wrongful discharge in the trial court on the theory that appellant discharged her for filing a suit against it in alleged contravention of the clear mandate of public policy expressed in Article 19 of the Declaration of Rights:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

Appellee argues that the public policy evidenced by this constitutional provision was violated when appellant discharged her in retaliation for her suit against it. We disagree.

Appellant did not, and could not, prevent appellee from pursuing her claims against it in the courts of this State. Appellee in fact pursued those claims embodied in the first three counts of her initial complaint and in her amended complaint fully. Her claims under those counts were adjudicated by the trial court which rejected them as a matter of law. Appellee has not appealed from those adverse judgments.

Viewing the evidence in a light most favorable to appellee, appellant's motivation for discharging appellee might have been based on a desire to sever its relationship with an employee who was actively pursuing litigation against it. Nevertheless, appellee had not cited any authority, and we are aware of none, which establishes any clear mandate of public policy which would prohibit such a decision by a private employer under the circumstances of this case.

The courts in other jurisdictions have reached similar conclusions. In *Alexander v. Kay Finlay Jewelers, Inc.*, 208 N.J.Super. 503, 506 A.2d 379 (1986), *cert. denied*, 104 N.J. 466, 517 A.2d 449 (1986), the court held that an allegation that an employer discharged an at-will employee because that employee exercised his right to sue the employer over a salary dispute did not state a cause of action for wrongful discharge. The tort of wrongful discharge had previously been recognized by the Supreme Court of New Jersey if the discharge was "contrary to a clear mandate of public policy." The intermediate appellate court concluded that the motivation alleged for the discharge in the case before it did not meet that test. The court reasoned:

While plaintiff had a legal right to sue his employer for monies considered to be due him as salary, there can be no question that the company also had a compelling interest to operate its business without the harassment of suits by employees dissatisfied with their wages or disgruntled because of a reduction in their salary. As the trial judge pointed out in granting defendant's summary judgment motion, plaintiff's continued employment at the reduced salary could subject the company to future suits by plaintiff in asserting claims to what he considered to be his rightful salary. It is evident to us that such an adversarial attitude between an employee and employer could be inimical to the operation of the company and that imposing any limitation upon the firing of a discontented employee would severely impact upon the employer's right to discharge those whose conduct could be harmful to the employer's business. Under these circumstances a balancing of the competing interests favors the employer.

Moreover, in our view defendant's termination of plaintiff's employment did not violate any clear mandate of public policy. There is no statutory or regulatory proscription against a firing in retaliation for the institution of a civil action against the employer as a means of resolving a salary dispute. Defendant's discharge of plaintiff was not in contravention of his exercise of a statutorily created right as in *Lally v. Copygraphics, supra* [173 N.J.Super. 162, 413 A.2d 960 (App.Div.1980), *aff'd*, 85 N.J. 668, 428 A.2d 1317 (1981)]. Nor, was it because of his refusal to perform any duties violative of public policy. *See Pierce v. Ortho Pharmaceutical Corp., supra* [84 N.J. 58, 417 A.2d 505 (1980)]. Rather, the dispute giving rise to the termination of plaintiff's employment involved a matter having no significance beyond the private interests of plaintiff and defendant.

*Id.* 506 A.2d at 381.

*Kavanagh v. KLM Royal Dutch Airlines,* 566 F.Supp. 242 (N.D.Ill., E.D.1983) is also apposite. It was there held that despite Illinois's recognition of a cause of action for

wrongful discharge where an at-will employee was terminated in contravention of a clearly mandated public policy, no such cause of action was alleged by an employee who was discharged because he retained an attorney, and threatened to sue his employer over a salary dispute. The court opined:

> Whenever a dispute between an employer and an at-will employee threatens to culminate in the employee's discharge, the employee, simply by retaining an attorney and threatening to sue, could procure that which is unavailable to him through contract—employment security. KLM persuasively argues that inherent in the employment-at-will relationship it had with plaintiff was an understanding that the organization and its managers function more effectively in an atmosphere of trust and cooperation; when this harmony is destroyed, regardless of who is at fault, it is in the interest of all concerned to terminate their relationship. The rule advocated in the complaint ironically would penalize a company for discharging an at-will employee when the employment relationship has completely soured. Plaintiff cannot stake his claim on the allegation that KLM by discharging him violated general public policies in favor of the right to counsel and the right to free access to the courts.

*Id.* at 244.

Similarly, in *Beam v. IPCO Corp.,* 838 F.2d 242 (7th Cir. 1988), the court held that an at-will employee who alleged that he had been discharged because he consulted an attorney in connection with a dispute he had with his employers had not stated a cause of action for wrongful discharge under Wisconsin law. The court reasoned that the discharge did not violate any stated public policy reflected in the constitution and statutes of Wisconsin.

## CONCLUSION

There is no clear mandate of public policy in this State which prevented appellant from discharging appellee, its at-will employee, because she had instituted litigation to

redress what she alleged were wrongs committed upon her by appellant and one of her fellow employees. Consequently, the necessary predicate to her asserted cause of action for wrongful discharge was lacking, and the court erred in submitting her claim to the jury.

JUDGMENT REVERSED;

COSTS TO BE PAID BY THE APPELLEE.

BISHOP, J., dissents.

BISHOP, Judge, dissenting.

Because I disagree with the majority's disposition of the first issue, I respectfully dissent. In *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals held that Maryland recognizes a cause of action, either in tort or in contract, for abusive discharge by an employer of an at will employee when such discharge is in contravention of some clear mandate of public policy. The majority here appears to be of the opinion that a "clear mandate of public policy" translates to require a codified expression of such policy. The majority opinion relies on cases where the public policies at issue were formulated. *Adler*, however, explicitly holds that such is not the case:

As indicated, the Court has not confined itself to legislative enactments, prior judicial decisions or administrative regulations when determining the public policy of this State. We have always been aware, however, that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch.... As Mr. Justice Sutherland stated for the Supreme Court in *Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930):

"The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the

basis of a judicial determination, if at all, *only with the utmost circumspection.* The public policy of one generation may not, under changed conditions, be the public policy of another." (Emphasis added.)

(Citations omitted.) *Adler, supra* at 45–46, 432 A.2d 464. Additionally, this court held that:

It is society's interest upon which primary focus is required. The source of the "clear mandate of public policy" may be found in legislative enactments, prior judicial decisions and administrative regulations, *or it may be undeclared, in which case, extreme care must be taken to insure that it is, in fact, the policy of the State.* In any case, the public policy found must be "sufficiently clear to provide the basis for a tort or contract action for wrongful discharge."

(Citations omitted.) (Emphasis supplied.) *Townsend v. L.W.M. Management, Inc.,* 64 Md.App. 55, 61, 494 A.2d 239 (1985).

The holding in the majority opinion limits the public policy asserted by appellant to that expressed in Article 19 of the Declaration of Rights. Article 19 provides that every person should have a remedy at law for injury done to him or her. Although it is widely held that the right to seek redress of grievances in court is not such a clear mandate of public policy on which to predicate an abusive discharge claim, *Alexander v. Kay Finlay Jewelers, Inc.,* 208 N.J.Super. 503, 506 A.2d 379 (1986), *cert. denied,* 104 N.J. 466, 517 A.2d 449 (1986); *Kavanagh v. KLM Royal Dutch Airlines,* 566 F.Supp. 242 (N.D., Ill., E.D.1983), under circumstances like those *sub judice,* this Court must inquire as to what the grounds were for such lawsuit. While the institution of a suit against an employer alone may not be enough to contravene public policy, this Court should not ignore the nature of the suit and the employer's conduct which may provoke it. The grounds for the suit itself may be in contravention of public policy. Only after an examination of the suit's basis is it possible to determine the nature of the public policy which may be violated.

At trial appellee stated that she was discharged for filing suit against her employer. Implicitly included in this assertion is the nature of the complaint and the facts which gave rise to it. I am aware that the trial court dismissed Counts I, II and III and, as a result one could conclude that the issue of the sexual harassment as to appellant is not before us. Count IV, the abusive discharge count, includes by reference all of the allegations included in the previous three counts. These counts clearly contain the sexual harassment claims and the facts contained in them, to the extent that they are the basis for Count IV, are included in that count. The dismissal of Counts I, II and II eliminates from the case the causes of action raised in those counts but did not eliminate the facts upon which they were based. The basis of the abusive discharge count was not simply the discharge taken in isolation from the facts upon which it was based but also includes those facts.

The cases cited by the majority are distinguishable because they do not concern such an intensely personal affront to the employee as in the case *sub judice,* where the employee was sexually harassed to the point of an assault and battery. A review of the cases cited by the majority makes this point clear: in *Alexander v. Kay Finlay Jewelers, Inc., supra,* the employee was discharged for filing suit against his employer in connection with a salary dispute; in *Kavanagh v. KLM Royal Dutch Airlines, supra,* an employee was discharged because he retained an attorney and threatened to sue his employer over a salary dispute; and in *Beam v. IPCO Corp.,* 838 F.2d 242 (7th Cir.1988), an at will employee was discharged for revealing confidential information to an attorney retained in connection with a dispute about job performance. In this case, appellee was discharged in retaliation for filing a law suit against appellant alleging sexual harassment that rose to the level of an assault and battery. It cannot seriously be doubted that this State has an undeclared yet clearly mandated public policy proscribing such conduct.

In *Adler,* the Court balanced various interests in determining that the at will rule must be excepted:

When terminated without notice, an employee is suddenly faced with an uncertain job future and the difficult prospect of meeting continuing economic obligations. But this circumstance, in itself, hardly warrants adoption of a rule that would forbid termination of at will employees whenever the termination appeared "wrongful" to a court or a jury. On the other hand, an at will employee's interest in job security, particularly when continued employment is threatened not by genuine dissatisfaction with job performance but because the employee has refused to act in an unlawful manner or attempted to perform a statutorily prescribed duty, is deserving of recognition. Equally to be considered is that the employer has an important interest in being able to discharge an at will employee whenever it would be beneficial to his business. Finally, society as a whole has an interest in ensuring that its laws and important public policies are not contravened. Any modification of the at will rule must take into account all of these interests.

As we have indicated, few courts have flatly rejected the notion that the wrongful discharge of an at will employee may give rise to a cause of action for damages. Where courts differ is in determining where the line is to be drawn that separates a wrongful from a legally permissible discharge. This determination depends in large part on whether the public policy allegedly violated is sufficiently clear to provide the basis for a tort or contract action for wrongful discharge.

*Adler, supra* [291 Md.] at 42, 432 A.2d 464. This same test is applied in other jurisdictions as well. *See Alexander v. Kay Finlay Jewelers, Inc.,* 208 N.J.Super. 503, 506 A.2d 379, 381 (1986), *cert. denied,* 104 N.J. 466, 517 A.2d 449 (1986); *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974).

This balancing of interests test must be applied to the case *sub judice* to meet the policy demands of the public.

The decision to make this exception to the at will employment rule can only be made after taking into account the employee's interest in job security, "particularly when continued employment is threatened not by genuine dissatisfaction with job performance," *Adler, supra* [291 Md.] at 42, 432 A.2d 464, the employer's interest in "being able to discharge an employee when it is beneficial to his business," *id.*, and society's interest in "ensuring that its laws and important public policies are not contravened." *id.* Appellant discharged appellee not for reasons of genuine dissatisfaction of job performance but because she performed an act which public policy would encourage—she filed suit to prevent continued sexual harassment in the work place. This must be weighed against appellant's interest in running the business as it sees fit. In addition, it is clear that a discharge of an employee at will, that is motivated by retaliation, is not in the best interest of the economic system or the public good. Therefore, it is this jurist's opinion that there is indeed a clear, although not explicitly declared, mandate of public policy on which to predicate appellee's cause of action. Such is not a novel idea. In *Monge v. Beebe Rubber Co., supra*, the Supreme Court of New Hampshire held the discharge of an employee, who alleged sexual harassment on the job, was "motivated by bad faith or malice or based on retaliation" and violated public policy. Despite the fact that *Monge* was based on an abusive discharge claim under the breach of contract theory, the Court of Appeals relied on it in *Adler, supra* at 36–37, 432 A.2d 464, in holding that the cause of action exists in Maryland. The test applied in New Hampshire is the same as that applied in *Adler* and the case *sub judice.*

To fail to implement that public policy in the case *sub judice* would give the message to employers that if harassment such as that present in this case occurs, the employer may let it persist until the employee can tolerate the harassment no longer and files suit in an attempt to terminate it. At that point the employer may discharge the employee with impunity. The message to the employee would be that

in order to protect herself or himself from such harassment, she or he may be required to lose her or his job with no legal redress against the employer. *Cf. Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978); and *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975).

I am not unaware that in *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), affirming *Makovi v. Sherman–Williams Co.*, 75 Md.App. 58, 540 A.2d 494 (1988) the cause of action for wrongful discharge was limited by the Court of Appeals. I believe that the case *sub judice* falls under the "narrow ground" exception explained by the Court in *Makovi* [316 Md.] at p. 620, 561 A.2d 179:

> Sometimes the facts underlying a discharge constitute both a violation of an anti-discrimination statute and of another, more narrowly focused, statute reflecting clear public policy but providing no civil remedy. *Lucas v. Brown & Root, Inc.*, 736 F.2d 1202 (8th Cir.1984) illustrates an analysis which utilizes the narrower ground. There the plaintiff alleged that she had been fired because she refused to sleep with her foreman. The court reasoned that "[a] woman invited to trade herself for a job is in effect being asked to become a prostitute." *Id.* at 1205. Prostitution was a crime denounced by Arkansas statute. The Eighth Circuit predicted the Supreme Court of Arkansas would find an abusive discharge because the plaintiff "should not be penalized for refusing to do what the law forbids."

In my opinion the general holding in *Makovi* does not apply to the case *sub judice*, regardless of whether the above exception is applicable or whether Judge Adkins was correct when he observed in his dissent:

> The majority attempts to explain *Lucas* on the ground that the plaintiff's ability to sue for wrongful discharge was based on the fact that she was being forced into prostitution in violation of a criminal statute, 316 Md. at 620, 561 A.2d at 187. This is unpersuasive. The plaintiff

**438**

alleged she was a victim of *quid pro quo* sexual harassment, a violation of Title VII. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Thus, she was allowed to bring a wrongful discharge action despite the existence of a civil remedy under Title VII.

316 Md. at 635, fn. 5, 561 A.2d 179.

For the above reasons I would affirm on the first issue.