587 A.2d 569

Serita J. WEATHERSBY

v.

KENTUCKY FRIED CHICKEN NATIONAL
MANAGEMENT COMPANY, et al.

No. 704, Sept. Term, 1990.

Court of Special Appeals of Maryland.

March 28, 1991.

534

Alan Banov and David Fishman, Washington, D.C., for appellant.

Dorothy R. Fait (Barbara A. Kestenbaum and Fait & Malament, on brief), Rockville, for appellees.

Argued before WILNER, C.J., and FISCHER and DAVIS, JJ.

DAVIS, Judge.

This case involves the circumstances surrounding the decision of Serita J. Weathersby, appellant, to resign from her employment with appellee, Kentucky Fried Chicken Management Company (KFC). After her resignation, appellant brought suit against KFC and its agent, appellee Lee Watts (Watts). Watts was appellant's immediate supervisor at KFC.

In an eight count complaint, appellant alleged the following: Count I—Wrongful Suspension and Demotion; Count II—Sexual Harassment and Reprisal; Count III—Discrimination on Account of Handicap; Count IV—Racial and Sexual Discrimination; Count V—Wrongful Constructive Discharge; Count VI—Breach of Employment Contract; Count VII—Defamation; and Count VIII—Intentional Infliction of Emotional Distress.

Prior to trial, appellant withdrew the sexual harassment element of Count II, Count IV, sexual and handicap discrimination, and Count VII, defamation. Appellees moved for summary judgment on the remaining counts. The trial court having granted the motions as to Counts I and V, wrongful suspension and wrongful constructive discharge, trial proceeded on the counts for reprisal, racial discrimination, breach of employment contract, and intentional infliction of emotional distress.

At the conclusion of appellant's case, appellees moved for judgment on the five remaining counts and the trial court heard additional argument on the wrongful constructive discharge cause of action. The lower court granted the motion for judgment as to the reprisal claim, and denied the motions as to the remaining counts.

At the close of their case, appellees renewed their motions for judgment; the trial court reserved ruling on the motions and submitted the issues to the jury. The jury returned verdicts in favor of appellees on the breach of contract and race discrimination count, and in favor of appellant on the intentional infliction of emotional distress claim, awarding her $145,000 in damages. The trial court granted appellees' motion for judgment notwithstanding the verdict as to the intentional infliction of emotional distress count.

On appeal, appellant presents the following questions for our review:

1. Whether the Circuit Court erred by dismissing appellant's claims of public policy torts by appellees in disciplining her for objecting to an illegal polygraph test.

2. Whether the Circuit Court erred by dismissing appellant's claim that appellee Kentucky Fried Chicken violated the Montgomery County Human Relations Law, Montgomery County Code, § 27–19, by disciplining her in reprisal because she complained about appellee Watts' romantic relationship with Ms. Miller.

3. Whether the Circuit Court abused its discretion by overturning the jury verdict for appellant on her claim of intentional infliction of emotional distress.

## FACTUAL BACKGROUND

Given the nature of the issues presented on appeal, appellant's version of the facts relating to her employment and eventual resignation shall be set forth in some detail.

In 1979 appellant began her employment with KFC. In October 1987, at her request, appellant was transferred

from her position as area manager for KFC's franchise services to training store manager at a store on University Boulevard in Wheaton, Maryland. From October 1987 to February 1988, appellant's immediate supervisor was appellee Lee Watts.

Prior to appellant's transfer in October 1987, new "interchangeable core" locks were installed on the doors of the Wheaton store. An interchangeable core lock, which is operated by a key, is located in the middle of an existing lock and may be removed and replaced as necessary. Once replaced, a new key is needed to operate the core lock. Under KFC policy, core locks were to be changed by KFC area managers whenever there was a management change in the store. On October 27, 1987, Watts, an area manager, had the core locks changed. After this change, Watts informed appellant that the locks were under his control and she should make no effort to have the locks changed. The locks were not changed after October 27, despite further changes in management at the store.

Also in October 1987, Watts developed a romantic relationship with an assistant manager at the Wheaton Store. Others at the store were aware of, and commented about, this relationship. Under KFC's Human Resources Manual, romantic relationships between KFC managers and subordinates were discouraged, were to be reported to higher authorities, and required movement of one of the parties to another store. In November 1987, appellant informed Watts that she believed he was having a romantic relationship in contravention of KFC's policies. She informed Watts that she believed the relationship was having a detrimental effect on the operation of the store.

According to appellant, after she registered her complaint about the relationship, Watts began harassing her. This harassment included, among other things, falsely stating that customer complaints were made against appellant forcing appellant to work from December 2 to December 24 without a day off and assigning sub par assistant managers to her.

On January 14, 1988, there was a theft from the Wheaton store safe. There was no indication of forcible entry. Appellant reported the theft to Watts. On January 20, appellant was informed that she was scheduled for a polygraph examination with respect to the theft. Although appellant objected to the test, Dave Davis, KFC Operations Manager for the Baltimore–Washington region, insisted that she submit to the polygraph examination. Appellant took the polygraph test on January 25. Davis demanded that appellant take another polygraph test after appellant informed the polygraph examiner that Watts had not changed the locks on the doors of the Wheaton Store since October 1987 despite managerial changes, and that Watts himself had keys to the core locks at the store.

On January 26, 1988, appellant asked Watts if he had informed the polygraph examiner that he (Watts) had not changed the store's locks since October 1987, and why he had not scheduled a polygraph examination for himself. At a meeting on January 27 between appellant, Watts, and Peter Davis, KFC's regional security director, appellant explained to Davis that Watts knew the locks had not been changed since October 1987 and the time of the theft in January 1988. She also informed Davis of Watts' relationship with the assistant store manager.

On or about January 28, Watts confiscated appellant's store keys and, without explanation, suspended her for ten days without pay "pending an investigation" of the theft.

On February 7, 1988, appellant was informed that, due to "serious misconduct," she was being demoted to assistant manager. As a result of this demotion, appellant's salary was reduced by $11,000. In addition, appellant was assigned to a different store managed by someone appellant had once supervised.

On February 9, appellant sought psychiatric treatment as a result of the events which transpired at her workplace. The doctor she consulted certified that she was unable to work. On February 11, appellant was again certified as

unable to return to work. While she was unable to work, appellant requested payment of Short Term Disability (STD) benefits, which KFC refused to pay. Under KFC's employment manual, managers, after 90 days or more of continuous service, are entitled to STD pay for six months upon notice of excused absence due to illness. A doctor's supporting statement certifying an inability to work is all that is required. Despite having been given the required certification, KFC required appellant to obtain a second opinion and made payment of benefits to her contingent upon obtaining same. There is no written requirement under KFC policy that a second opinion be obtained as to inability to work to be entitled to STD benefits. Accordingly, appellant objected to submitting to a second psychiatric examination.

On March 28, appellant was hospitalized at the Psychiatric Institute of Montgomery County. On April 12, she was diagnosed as being in a state of major depression, with psychotic features, and as having a borderline personality disorder. On or about May 8, 1988, appellant was discharged from the Institute. In the meantime, appellee KFC continued to refuse to pay STD benefits unless appellant would submit to an examination by a psychiatrist of its choosing.

In October 1988, appellant finally submitted to an examination by a psychiatrist selected by KFC. The doctor confirmed that appellant had been unable to work since February 1988. In December 1988, KFC paid appellant STD benefits, though at an assistant manager's rate and for only part of appellant's period of incapacitation.

By letter dated January 15, 1989, appellant resigned from her employment with KFC. Appellant's suit followed, and she appeals from the decisions of the circuit court.

## I.

### WRONGFUL DISCHARGE

▮ Considering first the issue of whether the lower court erred in dismissing appellant's wrongful discharge

claim, we are called upon to revisit our holding in *Moniodis v. Cook*, 64 Md.App. 1, 494 A.2d 212 (1985), in light of a modification of Md.Ann.Code art. 100, § 95 (1985, 1989 Cum.Supp.), which prohibits the use of a lie detector test as a condition of employment.

Appellant argues that the trial court should not have dismissed her claims for wrongful suspension and wrongful constructive discharge. Appellant contends that although § 95(b), (d), (e), and (f) provide administrative remedies for violation of the statute, the section does not provide the exclusive remedy for wrongful discharge, thereby precluding her private cause of action. We do not agree.

In *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals recognized for the first time an employee's common law cause of action for the tort of wrongful discharge as an exception to the general rule that an at-will employee may legally be terminated at any time and for any reason. Under *Adler*, damages for wrongful discharge are recoverable whenever the discharge violates some "clear mandate of public policy." *Id.* at 43, 432 A.2d 464. The Court noted that such a mandate may come in many forms, including legislative enactments, prior judicial decisions or administrative regulations. *Id.* at 45, 432 A.2d 464.

This Court, in *Moniodis, supra,* recognized that the express legislative prohibition contained in § 95(b) against requiring applicants for employment to submit to polygraph examination satisfied the *Adler* "clear mandate" requirement necessary for a wrongful discharge claim in Maryland. *Id.* at 10, 494 A.2d 212; *See also Townsend v. L.W.M. Management, Inc.*, 64 Md.App. 55, 494 A.2d 239, *cert. denied* 304 Md. 300, 498 A.2d 1186 (1985).

In *Moniodis*, employees of Rite–Aid of Maryland, Inc. (Rite–Aid) alleged that Rite–Aid, and certain Rite–Aid officers, required groups of Rite–Aid employees, to submit to polygraph examinations, in violation of § 95 because of inventory problems experienced at certain Rite–Aid stores. The jury returned a verdict in favor of the employees.

Rite–Aid argued on appeal that the polygraph statute should be interpreted to preclude the common law wrongful discharge action because the statute included a civil remedy for the employees whose rights had been violated. At that time, § 95 provided a civil remedy only for applicants for employment, not for established employees. Thus we rejected Rite–Aid's argument. Making the distinction, we said:

> We seriously doubt that a statutory remedy was indeed available to the appellees in the case at hand. The polygraph statute authorized the Attorney General to prosecute cases referred by the Commissioner of Labor and Industry, who was in turn authorized to institute proceedings only on behalf of any aggrieved *applicant* for employment, rather than established employees.... Therefore, we conclude that § 95 does not preclude the appellees' common law action.

*Id.* at 12, 494 A.2d 212. (Footnote and citations omitted, emphasis in original).

Since we decided the *Moniodis* case, § 95 has been amended to include employees (as opposed to applicants) and now reads in pertinent part:

(b) **Test prohibited; exemption.**—An employer may not demand or require any applicant for employment or prospective employment *or any employee* to submit to or take a polygraph, lie detector or similar test or examination as a condition of employment or continued employment. The prohibition of this section does not apply to the federal government or any agency thereof....

(d) **Investigation upon written complaint.**—Upon written complaint by an applicant for employment *or an employee* of an alleged violation of this subtitle, the Commissioner of Labor and Industry may cause an investigation to be made as to the existence of the alleged violation.

(e) **Mediation and conciliation; injunctive or other relief.**—If the Commissioner determines that a violation exists, he is authorized to endeavor to resolve any issue

involved under said violation by informal methods of mediation and conciliation, or he may institute, on behalf of any aggrieved applicant for employment *or an employee,* action in any court of competent jurisdiction in the subdivision in which the violation occurred seeking injunctive relief or other relief including money damages, resulting from the violation under this subtitle.

(f) **Duty of Attorney General.**—The Attorney General is authorized to prosecute all civil cases arising hereunder which are referred to him by the Commissioner for that purpose.

(g) **Penalty.**—Any employer who violates the provisions of this subtitle is guilty of a misdemeanor and subject to a fine not to exceed $100.

Md.Ann.Code art. 100, § 95. (Emphasis added).

Notwithstanding the amendment to the statute, appellant looks to *Moniodis* for support. In particular, appellant makes reference to the fact that a separate action, in which the *Moniodis* Rite–Aid employees did not fully participate,[1] was brought by the Attorney General under the statute on behalf of other Rite–Aid employees, and that the trial court recognized that the employees had a common law wrongful discharge cause of action under the statute. In addition, appellant urges that the case law since the statute was amended proceeds on an "assumption" that, notwithstanding the expanded scope of the statute, a private cause of action continues to be recognized for employees. Appellant cites for this proposition *People's Security Life v. Watson,* 81 Md.App. 420, 428, 568 A.2d 835 (1990) cert. granted 319 Md. 633, 574 A.2d 312 and *Glezos v. Amalfi Ristorante Italiano, Inc.,* 651 F.Supp. 1271, 1276 (1987). These arguments are not persuasive.

As to appellant's first contention, Judge Weant, speaking for this Court in *Moniodis,* specifically noted that the

---

**1.** The employee appellants in *Moniodis* elected not to join in the settlement reached in Sachs v. Rite Aid of Maryland, Inc. Docket 120A, A–60168 (Baltimore City Circuit Court 1981).

question of whether the Attorney General could rightfully represent the employees (as opposed to applicants) under the statute was never reached by the trial court because the case was settled. *Moniodis* at 12, n. 4, 494 A.2d 212. Therefore, contrary to appellant's assertion, there is no indication that the lower court approved the representation of employees in a wrongful discharge action brought under the statute.

*Watson* and *Glezos* lend no support to appellant's contention. *Watson* made clear that, at the time *Moniodis* was decided, § 95 was limited to providing a remedy for applicants for employment, as opposed to employees. The court in *Glezos* specifically noted, citing *Moniodis*, that no statutory remedy was available for the employee plaintiffs in that case and they could, therefore, proceed with a common law action for constructive discharge. *Glezos* at 1276.

Finally, appellant disputes the applicability of *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), upon which appellees, and the trial court, principally relied. In *Makovi,* the employee brought a wrongful discharge action against her employer, alleging she was discharged because of her pregnancy in contravention of Md.Ann.Code (1957, 1986 Repl.Vol.), art. 49B, §§ 14–18 and Title VII of the 1964 Civil Rights Acts §§ 701–718, as amended 42 U.S.C.A. §§ 2000e to 2000e–17. We affirmed the trial court's grant of summary judgment in favor of the employer at 75 Md.App. 58, 540 A.2d 494 (1988). The Court of Appeals also affirmed, holding that the tort of abusive discharge was limited to remedying only those discharges in violation of a clear mandate of public policy that otherwise would not be vindicated by a civil remedy. *Makovi,* 316 Md. at 605, 561 A.2d 179. In so holding, the Court found that the remedies available to the employee were sufficient to vindicate her rights.

Appellant seeks to distinguish *Makovi* from the present case by arguing that art. 100, § 95 does not contain a comprehensive scheme akin to that contained in the State

and federal anti-discrimination statutes.[2] In particular, appellant argues that the statute does not provide any administrative procedure, make an administrative complaint the exclusive remedy for violations, or otherwise provide a "specific" remedy for violations of the statute. This argument is unpersuasive.

Art. 49B §§ 3, 4, 9, 10, 11, and 12 embody the framework for enforcement of Maryland's anti-discrimination legislation. Under these sections, the Commission on Human Relations has the power to hold an investigative hearing for fact finding, to bring civil actions on behalf of complainants for injunctive relief, to receive and issue complaints alleging discrimination, to conduct investigations based on complaints received, to conduct hearings in cases of failure to reach agreement for the elimination of acts of discrimination, and to institute litigation to enforce compliance with the article.

Similarly, art. 100, § 95(d), (e), (f), and (g) provide a comprehensive scheme for remedying a violation of the statute. These sections empower the Commissioner of Labor and Industry to receive written complaints alleging violations of the statute and to investigate them. In addition, once he determines a violation exists, the Commissioner may resolve the issue through alternative dispute resolution methods or by instituting an action for injunctive or other relief, including money damages. Furthermore, the Commissioner may refer cases to the Attorney General, who is authorized to prosecute *all* civil cases arising under § 95.

In *Makovi* at 612–13, 561 A.2d 179, the Court of Appeals quoted with approval Judge (now Chief Judge) Wilner's analysis of *Adler* at 75 Md.App. 58, 64, 540 A.2d 494:

---

**2.** We observe that, by 1965 Md.Laws, ch. 717, the General Assembly declared equal employment opportunity to be a matter of state public policy and enacted the unlawful employment practice provisions contained in Title VII. Power of enforcement of the provisions was placed in the hands of the Human Relations Commission. *See,* Md.Ann.Code art. 49B, §§ 15 *et seq.*

It does seem clear ... that the Court was focusing on what it perceived to be a void in the law—a discharge not expressly and directly precluded by some specific statute but which nevertheless contravened some other general statement of public policy. If there were already an adequate alternative remedy in existence, the legitimate interest of the employee that the Court identified as being deserving of recognition would indeed have attained that recognition, and the newly created common law remedy would be unnecessary to assure its protection. This suggests the notion that the new cause of action was not intended to supplant existing statutory remedies, at least not those specifically crafted and effective to provide an adequate remedy for the unlawful act.

We hold that art. 100, § 95, as amended since *Moniodis,* is sufficiently crafted and effective in providing aggrieved persons with an adequate remedy for violations of the statute.

We recently considered the dismissal of an employee's action for abusive discharge based on the employer's alleged violation of the State Occupational Safety and Health Act. *Silkworth v. Ryder Truck Rental,* 70 Md.App. 264, 520 A.2d 1124 (1987). In *Silkworth,* the only claim that the employer acted in contravention of a "clear mandate of public policy" was an allegation that the employer failed to comply with a federal regulation requiring the establishment of "a safe procedure" for servicing multi-piece rim wheels and steps to "assure that employees are instructed in and follow that procedure." In concluding that Md.Ann. Code art. 89, §§ 28–49D constituted Silkworth's exclusive remedy, we said:

> To the extent that the violation of some standard adopted by the Commissioner can be said to constitute a "clear mandate of public policy" in the first instance, the exclusive remedy for that violation lies under MOSHA. As this case in particular demonstrates, any other view would seriously undermine the coherent administration of MOSHA. The Commissioner investigated the very

charge made by appellant in this case and found no violation. His fact-finding, under the statute, is conclusive; his legal conclusions can be tested by judicial review under the laws and rules governing administrative appeals. What appellant wants is for a court, in an original tort action, to review his factual and legal contentions *de novo* and to reach conclusions contrary to those of the Commissioner. That would emasculate the authority of the Commissioner, however, and would run directly contrary to the clear intent of the Legislature. It would also create the anomalous situation of an employee whose claim is found by the Commissioner to have merit being restricted to the statutory remedy of reinstatement and back pay, but an employee whose claim is found to have no merit being able to seek compensatory and punitive damages from a jury.

*Id.* at 270, 520 A.2d 1124.

We believe the reasoning set forth in *Moniodis, Makovi,* and *Silkworth* is controlling and, as such, the trial court did not err in dismissing the *Adler* wrongful discharge claim.

## II.

### SEXUAL HARASSMENT AND REPRISAL

■ Next, appellant contends that the lower court erred in dismissing her reprisal claims brought under § 27–19(b) and 20(a) of the Montgomery County Code, which, significantly, the Court of Appeals, during the pendency of this case, ruled was unconstitutional. *See McCrory Corp. v. Fowler,* 319 Md. 12, 570 A.2d 834 (1990).

Pursuant to Montgomery County Code § 27–20(a), appellant filed an administrative complaint alleging, *inter alia,* reprisal. Section 27–20(a) provides that a complainant may commence a suit 45 days after a complaint is filed with the Montgomery County Commission on Human Relations. After the 45-day period elapsed, appellant in this case amended the complaint she had already filed in the circuit

court to aver that appellees acted in violation of her rights under § 27–19(b) of the Code.

Section 27–20(a) is part of Montgomery County's legislative scheme to redress discriminatory practices. Chapter 27, Article I, of the Montgomery County Code created the Montgomery County Commission on Human Relations and provides for its jurisdiction. Sections 27–1 through 27–7B of Article I address the administration, duties and procedures of the Commission. The balance of the sections contained in Article I are divided into four divisions, with each division addressing one of the following areas of discrimination: Places of Public Accommodation, Real Estate, Employment, and Racial and Religious Intimidation. The present case implicates the third division, employment, codified at §§ 27–17 through 27–26.

Section 27–19(a) makes it an unlawful employment practice for an employer to discriminate against any individual because of the individual's race, color, religious creed, ancestry, national origin, age, sex, marital status, handicap, or sexual orientation.

Section 27–19(b) prohibits retaliation against any person on account of that person's lawful opposition to a violation of, *inter alia*, § 27–19(a).

Section 27–20(a) creates the cause of action at issue in this case:

> Any person who has been subjected to any act of discrimination prohibited under this division shall be deemed to have been denied a civil right and shall be entitled to sue for damages, injunction or other civil relief, including reasonable attorney's fees[.] . . .

Conceding that there is no Maryland case law supporting her position that the alleged relationship of her supervisor with an assistant manager and its impact on working conditions violated the Code's prohibition against sex discrimination, appellant relies on federal law. In particular, she cites Equal Employment Opportunity Commission regulations, including 29 C.F.R. §§ 1604.11(a) and 1604.11(g) which pro-

hibit not only direct *"quid pro quo"* sexual harassment of employees against their consent, but also "such conduct [which] has the purpose or affect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

Arguing that she made out a case of reprisal under federal case law[3] explicating EEOC "policies" regarding discrimination based on sexual favors, appellant asserts that her reprisal claim should not have been dismissed. In particular, appellant contends that the court erred in applying *DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 308 (2d Cir.1986), wherein the court held that voluntary romantic relationships could not form the basis of a sex discrimination suit under Title VII.

For reasons we shall explain, we need not decide whether appellant established a prima facie case of reprisal under the Code, whether a hostile environment claim was cognizable under Article 27 before *McCrory* was decided, or whether the lower court improperly relied upon *DeCintio.*

 Our explanation begins with the well-established principle of Maryland law that the retroactive operation of a statute is disfavored. *State v. Johnson,* 285 Md. 339, 343, 402 A.2d 876 (1979); *Cooper v. Wicomico County* 278 Md. 596, 366 A.2d 55 (1976); *Rigger v. Baltimore County,* 269 Md. 306, 305 A.2d 128 (1973). There is, however, an equally entrenched principle that

> absent a contrary intent made manifest by the enacting authority, any change made by statute *or court rule* affecting a remedy only (and consequently not impinging on substantive rights) controls all court actions whether accrued, pending or future.

---

**3.** *Meritor Savings Bank, Inc. v. Vinson,* 477 U.S. 57, 62–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Hides v. Gates Rubber Co.,* 833 F.2d 1406, 1415–16 (10th Cir.1987); *King v. Palmer,* 778 F.2d 878, 882 (D.C.Cir. 1985); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981); *Broderick v. Ruder,* 685 F.Supp. 1269, 1277 (D.D.C.1988).

*Aviles v. Eshelman Elec. Corp.* 281 Md. 529, 533, 379 A.2d 1227 (1977) (footnote omitted, emphasis added) citing *Janda v. General Motors,* 237 Md. 161, 168, 205 A.2d 228 (1964); *Richardson v. Richardson,* 217 Md. 316, 142 A.2d 550 (1958). Under Maryland law, statutes are remedial in nature if they are designed to correct existing law, to redress existing grievances and to introduce regulations conducive to the public good. *See State v. Barnes,* 273 Md. 195, 208, 328 A.2d 737 (1974). This action is "pending" subject to our determination of the issues presented on appeal.

In *McCrory, supra,* upon certification of questions from the United States District Court for the District of Maryland, the Court of Appeals held that the Montgomery County anti-discrimination ordinance was not a "local law" under Article XI–A of the Maryland Constitution. At the trial in the District Court, McCrory, Fowler's employer, sought dismissal of a § 27–19(b) reprisal claim. McCrory argued that Montgomery County exceeded its authority in enacting the ordinance under the Express Powers Act, Code (1957, 1987 Repl.Vol.), art. 25A, which granted powers to chartered home rule counties.

In agreeing that Montgomery County acted beyond its powers, the Court in *McCrory* [319 Md.] at 20, 570 A.2d 834 recognized the statute's strictly remedial nature:

> In creating a new judicial cause of action between private individuals, § 27–20(a) encroaches upon an area which heretofore had been the province of State agencies. In Maryland, the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State.

Thus, the Court held that enactment of the ordinance violated the Express Powers Act. In effect, § 27–20(a) was declared a nullity and it could not provide the basis for a cause of action for reprisal under § 27–19(b).

Given the holding of the Court in *McCrory, Aviles* necessarily controls our decision in this case. Accordingly, we

hold that, since § 27–20(a) was declared ultra vires during the pendency of this case, appellant cannot properly rely on the ordinance on appeal. The same result was obtained in *Aviles*. The statute at issue in *Aviles* concerned mechanics liens. Prior to the time the Court considered *Aviles*, it held portions of the statute to be unconstitutional. Thereafter, the General Assembly enacted a fundamentally different statute which expressly repealed the earlier statute without a saving provision. Appellants attempted to argue issues on appeal that were viable only under the repealed portions of the statute. The Court held that the sections of the statute it "repealed" prior to the time the General Assembly enacted the replacement statute "disappeared as affecting this case to the same extent as though they never existed." *Aviles* at 535, 379 A.2d 1227.

This same rationale supports our holding that the trial court properly dismissed appellant's § 27–20(a) claim.

## III.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

█ Finally, appellant avers that the court erred in granting judgment notwithstanding the verdict (n.o.v.) on her intentional infliction of emotional distress count.

In *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977), the tort of intentional infliction of emotional distress was first formally recognized in Maryland. In *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 477 A.2d 1197 (1984), we cited *Harris* in delineating the four elements of the tort which must coalesce to impose liability for intentional infliction of emotional distress. The required elements are that:

1. The conduct must be intentional or reckless;

2. The conduct must be extreme and outrageous;

3. There must be a causal connection between the wrongful conduct and the emotional distress; and

4. The emotional distress must be severe.

*Id.* at 657, 477 A.2d 1197.

The lower court, having found in its ruling sufficient evidence of the first, third, and fourth elements of the tort, appellant contends that there was also legally sufficient evidence presented to show the second element—that appellees' conduct was "extreme and outrageous" under Maryland law.

Under Maryland Rule 2–532, a motion for judgment n.o.v. is evaluated by the trial judge as if it were a motion for judgment made at the close of the evidence. The motion for judgment n.o.v. must be made on the same grounds that were advanced by the moving party seeking judgment under Md.Rule 2–519 at the close of the evidence. A party is not entitled to judgment unless evidence on the issue and all inferences fairly deducible therefrom, when viewed in the light most favorable to the party against whom the motion is made, are such as to permit only one conclusion with regard to the issue. *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 327, 389 A.2d 887 (1978); *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 262–63, 507 A.2d 203 (1986).

■ With respect to the tort of intentional infliction of emotional distress, "[i]n determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting detached from the surroundings in which it occurred." *Leese v. Baltimore County,* 64 Md.App. 442, 469, 497 A.2d 159 (1985) citing *Harris v. Jones,* 281 Md. 560, 568, 380 A.2d 611 (1977). Extreme and outrageous conduct exists only if the average member of the community must regard the defendant's conduct as being a complete denial of the plaintiff's dignity as a person. *Leese* at 469, 497 A.2d 159 citing *Dick v. Mercantile–Safe Deposit & Trust,* 63 Md.App. 270, 492 A.2d 674 (1985). In *Moniodis, supra,* at 17, 494 A.2d 212, we quoted *Harris* for the proposition

that in order for conduct to be extreme and outrageous it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community; liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

■ We also set forth in *Moniodis* at 17, 494 A.2d 212 the factors enumerated in *Harris, supra,* to be considered in determining whether a defendant's conduct rises to the level of "major outrage" required for a finding of extreme and outrageous conduct. These factors include (a) the actor's knowledge that the other is peculiarly susceptible to emotional distress, (b) the setting of the conduct, especially where the actor (such as an employer) is in a peculiar position to harass the plaintiff, and (c) the personality of the individual to whom the misconduct is directed.

In support of her contention that there was legally sufficient evidence to support the jury in its finding that appellees' conduct caused the emotional distress which resulted in her inability to work, her hospitalization at the Psychiatric Institute, and her decision to resign, appellant chronicles the events leading up to her resignation. It is clear that the conduct in question occurred in the context of appellant's employment with KFC. These events include her suspension without pay and without cause; her demotion without justification and with a one-third reduction in pay; and her assignment, after suspension and demotion, to work under a manager whom she had previously trained.

Appellant also recites, as evidence of appellees' extreme and outrageous conduct, the fact that her suspension came without warning, that no specific basis justifying the suspension was provided to her, and that the appellees' reason for the disciplinary action was pretextual—that she had failed to change the locks on the safe and the doors to the store and that a theft of the safe resulted from her omission.

She noted as well the fact of her "nervous breakdown," which she alleges was caused by her unfair treatment by KFC. She asserts that it was extreme and outrageous conduct for KFC to have denied her the benefits to which she was entitled due to her certified inability to work. Appellant also cites KFC's unjustifiable insistence, not in accord with any company policy, that she obtain a second opinion regarding the nature and extent of her illness before KFC would provide her with STD benefits.

In conjunction with this evidence, appellant argues that there was substantial evidence to show that the disciplinary actions taken against her arose from the complaint she made to her supervisor regarding his relationship with an assistant manager at the Wheaton Store. Appellant also cites evidence that her supervisor engaged in a "pattern of harassment" causing her undue stress. She claims as part of this pattern that her supervisor fabricated or exaggerated complaints that were made about her, assigned her assistant managers whom he knew or should have known were poor performers, and made her work excessive hours with inadequate staff support.

Finally, appellant claims that there was evidence presented showing that the appellees knew or should have known that the "unfair discipline" to which she was subjected would deeply affect her, given her personality and work record. On this issue, appellant relies on *Moniodis, supra,* pointing out that, like the prevailing plaintiff in that case, she has shown that she was a devoted employee who took her job quite seriously, had progressed steadily along a career managerial track for many years, and had otherwise manifested a high degree of integrity in the work place. Based on this evidence, appellant claims that the appellees could reasonably have expected her to react adversely to their conduct. In view of the evidence and the factors to be considered, we believe that the jury justifiably could have concluded that the conduct of KFC, through its agents, was extreme and outrageous.

As we have indicated, the conduct at issue involved the employer, its supervisors and a store manager. The employer, through its agents, was in a unique position to harass the appellant. If believed, there was substantial evidence from which the jury could have found, as they did, that appellees used this opportunity to the ultimate and significant detriment of appellant. There was evidence that appellees were in a unique position to know or they reasonably should have known, based on appellant's personality, character, integrity, and pride in her managerial position and work, that their conduct could have impacted significantly and detrimentally upon her. In addition, the jury could have found that KFC, through its agents, willfully violated appellant's statutory rights as discussed in Part I, *supra*.

Based on our review of the record in this case, we cannot say that the evidence and all inferences fairly deducible therefrom permit only one conclusion with regard to the issue; we therefore hold that the appellees were not entitled to judgment n.o.v. There was, before the jury, evidence from which it could reasonably conclude that appellees' conduct was extreme and outrageous in the context of appellant's intentional infliction of emotional distress claim.

JUDGMENT AFFIRMED AS TO COUNTS ONE AND TWO; JUDGMENT N.O.V. VACATED AND JUDGMENT REINSTATING JURY VERDICT ENTERED ON COUNT THREE IN FAVOR OF APPELLANT.

COSTS TO BE PAID BY APPELLANT.